Dibyendu K. BANERJEE, Plaintiff,

v.

BOARD OF TRUSTEES OF SMITH COLLEGE et al., Defendants.

Civ. A. No. 76–4370–K.

United States District Court,
D. Massachusetts.

June 30, 1980.

Max D. Stern, Steven Duditch, Stern and Shapiro, Boston, Mass., for plaintiff.

John H. Mason, William L. Patton, Ropes and Gray, Boston, Mass., for defendants.

Memorandum of Decision

## I. Background

KEETON, District Judge.

This is an action under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and under the Civil Rights Act of 1866, 42 U.S.C. § 1981, brought against Smith College and certain employees of Smith College for alleged acts of discrimination against plaintiff Dibyendu Banerjee on account of his race and national origin, in conjunction with the decision not to award plaintiff tenure in the English department at Smith College and to terminate

his employment. Plaintiff seeks reinstatement, back pay, and damages. In a memorandum filed after trial plaintiff states "that he assents to the dismissal of all defendants who are joined in their individual capacities." Plaintiff's Post Trial Memorandum, p. 17. In light of this statement, and because the court is aware of no basis in fact or in law for holding the individual defendants liable under 42 U.S.C. § 2000e *et seq.* or 42 U.S.C. § 1981, this action is dismissed as to defendants Vernon J. Harward, Jr., Frank H. Ellis, Harold Skulsky, Joan Bramwell, Edith Kern, Thomas C. Mendenhall, Margaret C. Waggoner, Vernon Gotwals, and George W. Villafranca.[1] Remaining as defendants are the Board of Trustees of Smith College, Dorothy N. Marshall, in her official capacity as chairperson of the Board of Trustees, and Jill K. Conway, in her official capacity as president of Smith College. These three defendants will hereinafter be referred to collectively as defendant Smith College.

## II. Structure of this Memorandum

■ Fed.R.Civ.P. 52(a) directs that the trial court, in all nonjury cases, "find the facts specifically and state separately its conclusions of law thereon . . . ." The Rule also declares that "[i]f an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein." Rule 52(a) is generally understood as requiring the trial court to make far more detailed findings of fact than a jury is required to make when a case is submitted under Fed.R.Civ.P. 49(a), requiring "a jury to return only a special verdict in the form of a special written finding upon each issue of fact." The contrast is sometimes expressed as one between findings on the "ultimate issues" ordinarily submitted to a jury and "subsidiary issues" on which a trial court is expected to make findings, along with its findings on the ultimate issues. *See Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 109, n. 2 (1st Cir. 1979) (hereinafter "*Sweeney*"). These subsidiary findings disclose the reasoning process as well as the ultimate finding of the factfinder.

The subsidiary findings tend to be findings of pure fact and usually are exclusively so. They are, for example, findings as to what was said and done, and when and in whose presence. The kinds of questions that a jury must answer in a special verdict (which are also among the questions on which the court in a nonjury trial must make findings) are, in contrast, often evaluative conclusions reached by applying a legal standard, defined by applicable law, to the facts as determined in the findings of pure fact. Inevitably there is risk that findings on mixed questions of fact and law will be infected by legal error in the conception of the legal standards explicitly or implicitly applied. Cases involving claims of discrimination are among those in which such a risk arises, as the Court of Appeals for the First Circuit has observed in the context of a claim of sex discrimination. *Id.* This Memorandum of Decision includes (1) a statement of the basis for subject matter jurisdiction (Part III); (2) a statement of the applicable law (Part IV); (3) subsidiary findings of fact, including (a) an appendix containing full subsidiary findings of fact and (b) a summary of those findings in the form of a chronology of significant events (Part V); and (4) evaluative findings (on mixed questions of law and fact) (Part VI). The court proceeds in this way in the hope, first, of achieving greater clarity of statement than might otherwise occur and, second, of thus exposing for more explicit scrutiny all questions regarding the extent to which evaluative findings (mixed questions of fact and law) are affected by legal conclusions defining the standards applied.

## III. Jurisdiction

This court has subject matter jurisdiction over the claims asserted in this case under 28 U.S.C. §§ 1331(a) and 1343(4) and 42 U.S.C. § 2000e–5(f)(3).[2]

---

1. Deceased as of December 25, 1977.

2. These statutes provide in relevant part as follows:

The district courts shall have original jurisdiction of all civil actions where the matter in

## IV. Applicable Law

### A. The Title VII Claim

42 U.S.C. § 2000e–2(a) provides in relevant part as follows:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise, to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

In its answer to plaintiff's complaint Smith College admits that it is an employer subject to Title VII.

■ "The central focus of the inquiry in a [Title VII disparate treatment] case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). Here, "the issue is not whether [plaintiff] was qualified for [tenure] or should have been [granted tenure during the years in question] by some objective measure, but whether [he] was denied [tenure] because [he was not white and was

not of European descent]." *Sweeney, supra*, citing *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979). Another way of stating the issue is whether plaintiff would have been granted tenure "had [he] been evaluated against the standard that was applied generally to [whites or persons of European descent]." *Sweeney, supra*, 604 F.2d at 114. Plaintiff must prove that his race or national origin was a determinative factor in the decision not to grant him tenure (or in the decision to terminate him) in the sense that he would have been granted tenure (or would not have been terminated) but for his race or national origin. *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014 (1st Cir. 1976); *Sweeney, supra; Fisher v. Flynn*, 598 F.2d 663 (1st Cir. 1979).

■ One way a plaintiff may establish a violation of Title VII is through presentation of direct evidence of discrimination. *Loeb, supra* (age discrimination). In a tenure case, such evidence may consist, for example, of proof that the votes of specific members of the decisionmaking body were influenced adversely by plaintiff's race or national origin. In this context, an issue of potentially critical importance is the relationship between the Title VII causation requirement—the requirement that plaintiff show that his race or national origin was a determinative factor in the negative employment decision—and the particular steps in the tenure-decisionmaking process. Clearly, plaintiff would have made out his case if he had been able to show that a specified number of members of the Tenure and Promotions Committee voted adversely to him, that a determinative factor in their decisions to vote adversely was plaintiff's race or national origin, and that had they voted affirmatively plaintiff would have been granted tenure. The causation infer-

---

controversy exceeds the sum or value of $10,000, exclusive of interests and costs, and arises under the Constitution, laws, or treaties of the United States . . .

28 U.S.C. § 1331(a);

Each United States district court . . . shall have jurisdiction of actions brought under this subchapter [42 U.S.C. §§ 2000e to 2000e–17].

42 U.S.C. § 2000e–5(f)(3);

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

. . . . .

(4) To recover damages or to secure equitable or other relief under any act of Congress providing for the protection of civil rights, including the right to vote.

28 U.S.C. § 1343.

ence becomes much more attenuated, however, when the focus of inquiry shifts from members of the Tenure and Promotions Committee (a College committee) to members of the English Department. The precise contours of the relationship among the Title VII causation requirement, the tenure-decisionmaking process at Smith College, and proof of plaintiff's claim by direct evidence are by nature mixed questions of fact and law to be addressed if essential to the court's decision, as a part of the evaluative findings.

■■■ A second way a plaintiff may establish a violation of Title VII is by evidence that is wholly or partly circumstantial rather than direct. The principal, though surely not the exclusive, route of proof through circumstantial evidence is identified in the analytic framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. That framework requires the plaintiff in a Title VII disparate treatment case to carry the initial burden of establishing a prima facie case of discrimination. If he successfully does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the action complained of. If the employer carries this burden, the plaintiff must then show that the articulated reason is a pretext for forbidden discrimination. *Id.; Furnco, supra; Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). At least in the First Circuit, trial courts are required to evaluate the evidence in the light of this framework. *Blizard v. Fielding*, 572 F.2d 13 (1st Cir. 1978).

In *McDonnell Douglas* the Supreme Court indicated that a Title VII plaintiff could establish a prima facie case of racial discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. In a footnote the Court noted that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802, n. 13, 93 S.Ct. at 1824. The flexible nature of the elements necessary to make· a *McDonnell Douglas* prima facie showing was reiterated in *Furnco*, when the court stated that the *McDonnell Douglas* formulation "was not intended to be an inflexible rule" and that "[t]he method suggested in *McDonnell Douglas* . . . . was never intended to be rigid, mechanized, or ritualistic." 438 U.S. at 575, 577, 98 S.Ct. at 2949. *Furnco* further indicated the nature and purpose of the prima facie showing:

A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. See *Teamsters v. United States* [431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396] at 358 n. 44, 97 S.Ct. 1843. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

438 U.S. at 577, 98 S.Ct. at 2949. In commenting upon the elements of the prima facie showing set forth in *McDonnell Douglas* and elaborated in *Furnco*, the Court of Appeals for the First Circuit has noted:

In view of the fact that the Court has never passed on the viability of the par-

ticular elements of the *McDonnell Douglas* prima facie case outside the factory hiring setting, we caution against automatic reliance on those elements when the employment setting is such that their proof does not make discrimination a probability. For example, if a qualified black were turned down for a job for which there were 100 applicants for every opening and the practice, rather than being to hire the first qualified applicant who appeared, was to choose on the basis of qualifications, recommendations and subjective impressions gleaned from an interview, it would hardly seem "more likely than not" that the applicant was rejected because of race.

*Loeb, supra,* 600 F.2d at 1017, n. 18.

A threshold problem in the case at bar, then, is how properly to formulate the elements of a *McDonnell Douglas* prima facie case in the context of a claim of discrimination in the denial of tenure. The parties agree as to the definition of three of the elements:

(1) that plaintiff is a member of a racial or national origin minority;

(2) that plaintiff was a candidate for tenure and was qualified under Smith College standards, practices, or customs; and

(3) that despite his qualifications plaintiff was rejected.

The parties disagree with respect to what the fourth and final element of plaintiff's *McDonnell Douglas* prima facie case should be. Plaintiff asserts that the fourth element is "that after his rejection (i) Smith College continued to tenure white (non-minority) persons in plaintiff's department; or (ii) Smith College continued to employ others to perform the functions plaintiff was qualified to and did perform and could reasonably be expected to have similar needs for the length of plaintiff's proposed tenure." Plaintiff's Trial Memorandum, p. 6. Defendant asserts that as the fourth element "plaintiff must prove that at or near the time of his rejection, Smith granted tenure to white persons in plaintiff's department who were no more qualified than plaintiff for such an award." Defendant's Trial Brief, p. 8.[3]

How the elements of the prima facie case should be framed depends in part on how the term "prima facie" is being used. There are at least two contrasting general senses in which the term "prima facie" showing is used: (1) proof of facts sufficient to permit a finder of fact to find in favor of the plaintiff; (2) proof of facts not only sufficient for this purpose but compelling such a finding in the absence of production by the defendant of rebutting evidence. *See* Black's Law Dictionary (5th ed. 1979). It may be argued that it is not entirely clear how the Supreme Court is using the term in the context of the *McDonnell Douglas* type of analysis. From some statements it might be inferred that "prima facie" showing is being used in the first sense—that is, to mean proof of facts sufficient to permit a finder of fact to find in favor of the plaintiff, but not sufficient to compel that finding even if the defend-

---

**3.** Some courts have imposed an additional requirement of the existence of procedural irregularity in the tenure consideration process. *E. g., Huang v. College of the Holy Cross,* 436 F.Supp. 639, 653 (D.Mass.1977) ("the burden on the plaintiff is to prove: (i) that he belongs to a racial minority; (ii) that the procedure followed by the College in his case was irregular; (iii) that he was at least as qualified in accordance with the College's own standards as other candidates who did receive tenure that same year; and (iv) that he was a candidate for tenure and despite his qualifications he was denied it"); *cf. Kunda v. Muhlenberg College,* 621 F.2d 532, 541, 22 F.E.P. Cases 62, 72 (3d Cir., Feb. 19, 1980) (sex discrimination) (disapproving district court's imposition of "additional requirement" of showing significant procedural irregularity or, alternatively, that males with similar qualifications were granted tenure during period when plaintiff was being considered, but noting that existence of procedural irregularity was relevant to question of intent and that granting of tenure to comparable males "is already part of the required Title VII case, since it fits within the fourth *McDonnell Douglas* factor paraphrased for this situation to require a showing that there were tenure positions open and the employer continued to grant tenure to comparable male members").

ant offers no rebuttal or explanation. The following passage from *Furnco* appears to be consistent with this first sense of "prima facie" showing:

> *McDonnell Douglas* did make clear that a Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one *can* infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act."

438 U.S. at 576, 98 S.Ct. at 2949 (emphasis added). If this is the intended meaning of "prima facie" showing in the *McDonnell Douglas* framework for analysis, that framework is in essence an aid to common sense weighing of inferences from circumstantial evidence of discrimination.

If, instead, a "prima facie" showing is taken to mean evidence that compels rather than merely permits a finding in favor of plaintiff in the absence of rebuttal or explanation, a very different structure for decisionmaking is created.[4] It is then necessary to consider whether the plaintiff, in order to make a "prima facie" showing, in this compelling sense, must offer proof of such convincing quality that a factfinder, applying common sense methods of factfinding by circumstantial evidence, could not reasonably find against the plaintiff. If so, the legal consequence of the "prima facie"

showing is extraordinarily favorable to the plaintiff, but the difficulty of making that showing is so great that it could seldom be made.

In addition to the issue as to whether "prima facie" showing is used in the sense of proof that compels or instead in the sense of proof that permits a finding for the plaintiff when not rebutted, a second question arises. Is the legal consequence of a "prima facie" showing within the *McDonnell Douglas* framework merely a shifting of the burden of production (either of evidence, or of analysis)?[5] Or has the Supreme Court chosen in this instance to create a legal doctrine that has ongoing consequences even after it is determined that the defendant has met the burden of showing nondiscriminatory reasons for its action? That is, has the Court fashioned not merely an aid to weighing of evidence but instead a doctrine that places on the scales of justice an added weight in plaintiff's favor—giving to the evidence that makes up the "prima facie" showing not merely the weight it has in supporting inferences that might ordinarily be drawn by a factfinder but also an added weight in the plaintiff's favor because it constitutes such a "prima facie" showing?[6]

There are statements in *Furnco* that might be interpreted as an indication that the prima facie showing carries some added

---

**4.** There may also be a theoretical distinction among the inference processes behind this type of prima facie case. On the one hand, a finding for the plaintiff may be compelled in the absence of rebuttal because the elements of the prima facie case, standing alone, are such that the factfinder could not reasonably find against the plaintiff in the absence of additional evidence. On the other hand, a finding for the plaintiff may be compelled in the absence of rebuttal not because of an inference to be drawn from the elements of the prima facie showing alone but because of an inference to be drawn from the conjunction of the elements of the prima facie showing and the lack of rebuttal.

**5.** One may be skeptical that it is a burden of production of evidence, since this framework is often applied after both parties have developed the evidence fully. *See Loeb, supra,* 600 F.2d

at 1016 ("*McDonnell Douglas* is to a large extent an analytical framework enunciated *post hoc,* in light of a given set of facts, to give judges a method of organizing evidence and assigning the burdens of production and persuasion in a discrimination case"); *Blizard v. Frechette,* 601 F.2d 1217 (1st Cir. 1979) (rejecting argument that *McDonnell Douglas* requires not just a method of analysis but also a method of receiving and responding to proof at trial). Is the burden, then, to be viewed as a burden of analysis—a burden of developing arguments in a structured way—in contrast with the burdens of production that, in a jury trial, may lead to a directed verdict when the defendant fails to meet his burden?

**6.** An analogous question has arisen with respect to the effect of an application of the doctrine of res ipsa loquitur. See Prosser, Torts § 40 (1971).

weight. For example, the Court stated, "[a] prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." 438 U.S. at 579, 98 S.Ct. at 2751. Since "presume" and "presumption" are sometimes used in a special sense that contrasts with "infer" and "inference," this passage might be interpreted as placing on the scales in plaintiff's favor the added weight of a special legal doctrine. But other passages in *Furnco* appear to support more strongly an interpretation that the *McDonnell Douglas* framework for analysis is aimed instead at developing a method and structure of analysis that will aid factfinders in making certain that they do not overlook methods of reasoning that tend to support circumstantial inferences of discrimination in cases in which direct evidence is inherently unlikely to be available. The following passage, and the passage quoted on page 1154, *supra*, are examples:

A *McDonnell Douglas* prima facie showing is not the equivalent of a factual finding of discrimination, however. Rather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.

438 U.S. at 579–580, 98 S.Ct. at 2951. Moreover, the Court of Appeals for the First Circuit has indicated that "[T]he inference of discrimination created by the prima facie case is dispelled once the employer's reason is stated, until and unless the latter is shown to be a pretext. . ..." *Loeb, supra*, 600 F.2d at 1015.[7]

Read together and in context, the decisions of the Supreme Court in *McDonnell Douglas* and *Furnco*, and the decisions of the First Circuit in *Loeb, Sweeney* and *Blizard*, support the conclusion that a "prima facie" showing is made when the plaintiff produces evidence sufficient to support, though not compelling, a finding of discrimination in the absence of rebuttal or explanation. They also support the conclusion that the prima facie showing once rebutted continues to be relevant and is entitled to the weight it ordinarily would have in supporting inferences drawn by a factfinder, but not any rigid or ritualistic additional weight.

With this definition of prima facie in mind, the court concludes that the elements of a prima facie showing for the case at bar consist of proof of the following elements:

(1) that plaintiff is a member of a racial or national origin minority;

(2) that plaintiff was a candidate for tenure and was qualified under Smith College standards, practices or customs;

(3) that despite his qualification plaintiff was rejected; and

(4) that tenure positions in the Department of English at Smith College were open at the time plaintiff was denied tenure, in the sense that others were granted tenure in the department during a period relatively near to the time plaintiff was denied tenure.

■ With respect to the second element, plaintiff need show only that he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made. That is, he need only show that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both

---

**7.** In a footnote to this passage the Court added:
Although the Supreme Court has never discussed explicitly the significance of the prima facie case after the employer articulates a legitimate reason, we may assume that the evidence used to establish the prima facie case remains relevant, and can help sustain a verdict for the plaintiff if the employer's reason is discredited, but that any other evidence bearing on motive should also be considered. *See Furnco*, 438 U.S. at 580, 98 S.Ct. 2943.
600 F.2d at 1015, n. 14.

a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decisionmaking body. Qualifications of other candidates for tenure considered within a period relatively near to the time plaintiff was considered are relevant to this second element of plaintiff's prima facie case to the extent that they help define this group.

■ With respect to the fourth element, plaintiff need not make any showing regarding the qualifications of persons granted tenure. Their qualifications are more appropriately considered as part of the employer's rebuttal of the prima facie case or as part of plaintiff's showing of pretext.

### B. The Claim Under 42 U.S.C. § 1981

■ 42 U.S.C. § 1981 provides in relevant part as follows:

> All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.

Section 1981 has been held to prohibit discrimination in private employment on the basis of race. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). As a general proposition, § 1981 and Title VII are not comprehensive in their coverage. *Johnson, supra.* In this case, however, the same factual predicate is alleged to constitute a violation of both, and no suggestion has been made that the requirements for establishing a violation of § 1981 are different in any manner from the requirements for establishing a violation of Title VII. The primary difference of potential significance at this juncture is the scope of available relief.[8] Accordingly, for the purpose of determining liability in this case, the court may treat plaintiff's § 1981 claim and Title VII claim as coextensive.

### V. Subsidiary Findings of Fact

In a separate document, full subsidiary findings of fact are being filed in this case, at the time this Memorandum of Decision is released. This Part V summarizes those findings in the form of a chronology of significant events.

---

**8.** "An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages. . . . And a backpay award under § 1981 is not restricted to the two years specified for backpay recovery under Title VII." *Johnson, supra*, 421 U.S. at 460, 95 S.Ct. at 1720. On the other hand, 42 U.S.C. § 2000e–5(g) provides in relevant part as follows:

> (g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years to the filing of a charge with the Commission.

*See DeGrace v. Rumsfeld*, 614 F.2d 796, 808 (1st Cir. 1980).

## CHRONOLOGY OF SIGNIFICANT EVENTS

| DATE | EVENT |
|------|-------|
| 3–15–66 | Banerjee appointed Lecturer in Department of English (the "Department") at Smith for period of 2 years to commence 7–1–66, teaching duties to begin 9–66. |
| 3–8–68 | Banerjee's appointment renewed for additional 2-year period, Department unanimously recommending renewal. |
| 3–16–70 | Banerjee reappointed for another 2-year period. |
| 9–22–70 | Banerjee's rank changed from Lecturer to Assistant Professor as result of completing requirements for Ph.D. |
| Fall 1971 | Professor Petersson discusses with Banerjee options available to him for timing of tenure decision. Banerjee opts for decision in 1971–1972 academic year. |
| 11–29–71 | Department votes 5–3 in favor of recommending Banerjee for tenure. |
| 11–30–71 | Professor Connelly notifies Banerjee in writing that by divided vote Department has voted to recommend Banerjee for tenure. |
| 12–8–71 | Professor Connelly transmits vote in writing to President Mendenhall as part of letter regarding Department budget for following year. |
| 12–71; 1, 2–72 | Members of Department voting on Banerjee's case write confidential letters to Committee on Tenure and Promotions ("T & P") explaining their votes. |
| 1–31–72 | T & P first considers Banerjee's case and decides to meet with Department on 2–19–72. |
| 2–6–72 | Professor Skulsky writes his letter to T & P indicating that although he had voted in favor of recommending Banerjee for tenure at meeting of Department in 11–71, his reasons for doing so had not concerned merits of case and he had since concluded that these reasons were erroneous. |
| 2–19–72 | T & P meets with Department concerning Banerjee's case. Department members formally notified for first time of Professor Skulsky's changed vote. After Department members leave T & P decides to obtain and read various poems written by Banerjee. |
| 3–3–72 | T & P votes 4–1 against recommending Banerjee for tenure, with one abstention. |
| 3–7–72 | Abstaining T & P member submits motion for reconsideration of Banerjee's case. |
| 3–15–72 | T & P votes 4–0, with two abstentions, in favor of allowing abstaining member's motion for reconsideration. After further discussion of Banerjee's case, Professor Dimock moves that Banerjee's be recommended for tenure. Motion fails for lack of second. |
| 3–24–72 | President Mendenhall writes Banerjee informing him of adverse decision by T & P and that his present appointment would be his last. |
| Spring 1972 | Professor Petersson tells Banerjee that he believes xenophobia was involved in negative decision on tenure. |
| 2–22–73 | Banerjee makes written request to T & P for reconsideration. |
| 3–3, 8, 12–73 | T & P considers Banerjee's request for reconsideration. |
| 3–29–73 | President Mendenhall replies for T & P rejecting Banerjee's petition for reconsideration. |
| 4–21–73 | Banerjee and his wife meet with President Mendenhall to object to 3–29 letter. Mendenhall suggests Banerjee take his case to about-to-be-constituted Grievance Committee. Banerjee rejects suggestion. |
| 4–23–73 | Banerjee writes Mendenhall a memorandum detailing his objections. |
| 4–26–73 | Mendenhall replies to Banerjee's memorandum, again suggesting he take his case to Grievance Committee. |
| 4–29–73 | Banerjee writes letter rejecting Grievance Committee idea and requesting that matter be placed before Trustees at their next meeting, on 5–5–73. |
| 5–3–73 | President Mendenhall writes letter presenting matter to Trustees. |
| 5–5–73 | Trustees by resolution decline to act favorably to Banerjee. |
| 5–7–73 | President Mendenhall writes letter informing Banerjee of Trustees' action. |
| 5–73 | Grievance Committee established to investigate and consider alleged violations of Faculty Code. |
| 6–28–73 | Banerjee submits written grievance to Grievance Committee. |
| 1–10–74 | Grievance Committee votes on its decision on Banerjee's case. |
| 1–28–74 | Grievance Committee issues findings on Banerjee's case. |

1158

| DATE | EVENT | DATE | EVENT |
|------|-------|------|-------|
| 1–29–74 | President Mendenhall telephones offices of AAUP in Washington, D.C. for advice on procedure to be used in reconsidering Banerjee's tenure case. | 4–18–74 | T & P discusses Professor Petersson's letter and decides to seek advice of counsel and written confirmation of AAUP advice. |
| 2–5–74 | T & P unanimously votes to accept report of Grievance Committee, to comply with its recommendations, and to follow President Mendenhall's proposals for procedure to be followed in reconsidering Banerjee's tenure case. | 4–24–74 | President Mendenhall writes to AAUP seeking confirmation of advice concerning reconsideration procedure. |
| 2–6–74 | President Mendenhall writes to Chair of Grievance Committee notifying him of T & P's decision and asking to be notified if Grievance Committee disagrees with any of procedures T & P proposed to follow. | 4–25–74 | President Mendenhall writes letter to Professor Petersson responding to Petersson's letter of 4–16–74, explaining reasons for procedure employed and asking for explanation of reference to missing documents in 4–16–74 letter. |
| 2–10–74 | Department votes 7–4 against recommending Banerjee for tenure, with one abstention. | 5–2–74 | AAUP confirms advice regarding reconsideration procedure. |
| 2–12–74 | Professor Pickrel sends letter to President Mendenhall as Chair of T & P reporting new vote, copies of this letter also being sent to Banerjee in India and in care of his father-in-law in Canada. | 5–7–74 | In response to question raised by Banerjee in his letter of 3–11–74, President Mendenhall sends memorandum to all members of Department participating in reconsideration asking them to review official copy of Banerjee's doctoral thesis. |
| | President Mendenhall writes Banerjee informing him for first time of procedure adopted for reconsideration and that he would notify Banerjee as soon as T & P had completed its review. | 5–9–74 | T & P decides that when members of Department read correct copy of thesis they should also read copies of various poems submitted by Banerjee to T & P during original consideration of his case. |
| 2–25–74 | Banerjee cables Mendenhall from Rome: "Postpone Tenure Consideration Until Return Question Procedure." | 5–11–74 | Professor Petersson sends President Mendenhall a letter in response to Mendenhall's letter of 4–25–74, explaining that missing documents referred to in letter were reports on Banerjee's teaching prepared by Professor Ellis (a duplicate of which had been found) and himself (no duplicate). |
| 2, 3, 4–74 | Members of Department except Professor Young send confidential letters to President Mendenhall explaining their votes. | | |
| 3–5–74 | Banerjee sends letter to President Mendenhall questioning reconsideration procedure, submitting articles for consideration by T & P, and indicating people he had asked to write to T & P on his behalf. | 5–13–74 | Professor Pickrel distributes copies of poems to voting members of Department. |
| | | 5–14–74 | Professor Van Voris requests President Mendenhall to have T & P also distribute to Department copies of letters from outsiders written in preceding months in support of Banerjee. |
| 3–8–74 | President Mendenhall replies on behalf of T & P to Banerjee's letter of 3–5–74. | | |
| 3–11–74 | Banerjee writes letter responding to Mendenhall's letter of 3–8–74. | 5–15–74 | Banerjee meets with President Mendenhall to discuss reconsideration of his tenure case. |
| 4–16–74 | President Mendenhall receives letter from Professor Petersson explaining Petersson's positive vote on reconsideration and questioning reconsideration procedure. | 5–16–74 | President Mendenhall writes letter on behalf of T & P to Professor Van Voris, declining his request. |
| | | 5–20–74 | Department votes 6–4 against recommending tenure for Banerjee. |

| DATE | EVENT | DATE | EVENT |
|---|---|---|---|
| | Professor Pickrel writes letter to President Mendenhall reporting the vote. | | cision not to consider letters from outsiders received during preceding months. |
| 5–20, 21–74 | Voting members of Department write letters to President Mendenhall explaining their votes. | 5–29–74 | T & P unanimously votes to accept Department recommendation against tenure for Banerjee. |
| 5–23–74 | Professor Pickrel sends letter to Banerjee reporting Department vote. | 6–1–74 | President Mendenhall, on behalf of T & P, notifies Banerjee in writing of decision by T & P against tenure. |
| | Department meets with T & P to discuss Banerjee's case. After Department leaves T & P again agrees not to consider letters on Banerjee's behalf received from outsiders during early 1974. | 7–22–74 | Banerjee files complaints against Smith with EEOC and MCAD. |
| | | 9–17–76 | EEOC issues right-to-sue letter. |
| 5–27–74 | T & P decides not to request or allow Banerjee to make personal appearance before it and reaffirms de- | 12–9–76 | Banerjee commences present action in this court. |

## VI. Evaluative Findings

The closest thing to direct evidence of racial or national origin discrimination against plaintiff offered at trial was the testimony concerning Professor Petersson's statement at the time of the initial consideration of plaintiff's tenure case to the effect that Professor Petersson thought that xenophobia was involved in the negative decision. However, the court credits Professor Petersson's testimony at trial that he was using the term to refer not to any racial or national origin prejudice but rather to the tendency of some members of the English Department to be oriented restrictively to English literature rather than being open to the values of comparative literature. It would be a gross distortion of the perceptive and reflective views of Professor Petersson, empathetic as they were to plaintiff, to treat his 1972 statement as proof of discrimination based on race or national origin when his testimony at trial, which the court credits, explains his correct usage of the term xenophobia in a way that is not synonymous with, and in fact is contrary to, the decision in plaintiff's case having been based on racial or national origin discrimination.

■ Plaintiff has made out a prima facie case of discrimination on the basis of race or national origin, as defined in Part IV, *supra*. Plaintiff has shown: (1) that he is a member of a racial or national origin minority (Bengali); (2) that he was a candidate for tenure at Smith College and was qualified under Smith College standards, practices, or customs, in the sense that he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made; (3) that despite his qualifications he was rejected; and (4) that tenure positions in the English Department at Smith were open at the time plaintiff was denied tenure, in the sense that others were granted tenure in the department during a period relatively near to the time plaintiff was denied tenure.

The reason articulated by Smith for the denial of tenure was as follows:

Plaintiff was denied tenure because he did not receive the requisite number of votes from members of the Committee on Tenure and Promotion of Smith College. Since the vote of the Committee was a group decision, no single reason or set of reasons can be provided as to why the Committee voted as it did. In general the Committee determined, based on all of the materials that were available to it, that the breadth and depth of the plaintiff's scholarship, considered in conjunction with the quality of his teaching and his service to the college, did not in the

Committee's best judgment warrant an award of tenure. . . .

This reason is facially valid, in the sense that it accurately describes the procedural reason plaintiff was denied tenure ("he did not receive the requisite number of votes from members of the Committee on Tenure and Promotion") and the basis for the decision ("the Committee determined, based on all of the materials that were available to it, that the breadth and depth of the plaintiff's scholarship, considered in conjunction with the quality of his teaching and his service to the college, did not in the Committee's best judgment warrant an award of tenure").

Plaintiff has not established that this reason was a pretext for racial or national origin discrimination. Plaintiff's case was not such that only a decision for tenure could be supported, nor was it a case in which only a decision against tenure could be supported. Rather, on the basis of the material before it, T & P reasonably could have decided for or against tenure. Plaintiff has not demonstrated that any member of T & P who voted on his case, either at the initial consideration or at the reconsideration, voted against him because of plaintiff's race or national origin. Nor has plaintiff established that any members of the English Department voting on his case, either initially or upon reconsideration, voted adversely to plaintiff on account of his race or national origin. The evidence shows a closely divided Department the members of which had conflicting views regarding plaintiff's value to the Department. As revealed by their letters to T & P, those voting to recommend tenure for plaintiff tended to focus on plaintiff's value to the Department as a comparativist, while those voting against recommending tenure for plaintiff tended to focus on perceived deficiencies in plaintiff's scholarship, in particular on the quantity and stylistic qualities of his writing. As revealed by the evidence at trial, both these positions were reasonable.

Plaintiff would have been valuable to the emerging comparative literature program, but the program could have, and in fact did, flourish without him. The quantity of plaintiff's scholarship was not impressive, whether judged at the time of the original consideration or instead judged after taking account of additional works completed or in progress by the time of the reconsideration. It was sharply disputed whether the quality of his writing should be regarded as a negative factor. It is not the function of a court, in these circumstances, to substitute its judgment of the quality of scholarship for the formally expressed judgment of the tenure-decisionmaking body of the college. The expert testimony offered at trial is useful to the court in showing that the quality of the scholarship is neither so poor nor so distinguished that the tenure-decisionmaking body could reasonably decide only one way.

In the circumstances of this case, the college could reasonably conclude that plaintiff's writing is not distinguished in quality or quantity, but that does not end the inquiry. Absence of distinction in scholarship did not set plaintiff entirely apart from some of the other members of the English Department. Plaintiff may well have been measured against a more rigorous standard for tenure than some of his more senior former colleagues in the English Department. The emphasis placed on objections to his scholarly writing by members of the Department who voted against him manifested a more demanding standard than had been applied in previous years. In this sense, he was subjected to differential treatment in comparison with some of the persons who had been granted tenure in years previous to the years in which he was considered for tenure. This kind of differential treatment, however, does not entitle plaintiff to prevail. He must show that he was subjected to a different standard *because of* his race or national origin. The court concludes that the differential treatment of plaintiff as compared to some of his more senior former colleagues in the English Department was not the result of discrimination against plaintiff on account of his race or national origin; rather, it was a result of increased

competition for tenure positions—variously described as "the new professional situation" the college found itself facing in the early 1970s with respect to candidates for tenure and the "golden moment for strengthening the faculty."

Nor does the evidence support the conclusion that plaintiff was treated any differently from any of his immediate peer group of English Department tenure candidates. Although the Grievance Committee found that procedural irregularities existed in the manner in which plaintiff's case was originally handled by the English Department, it also found that the irregularities "did not occur because their perpetrators acted in bad faith." The court credits these findings and reaches the same conclusions. The primary irregularity—"the central question" in the language of the Grievance Committee report—was Professor Skulsky's change of vote in his letter to T & P. Skulsky's letter to T & P regarding plaintiff (Exhibit 40) is a detailed, thorough, and thoughtful evaluation of plaintiff's case. The court concludes that the reasons it advances for voting against a recommendation of tenure for plaintiff were not pretexts for racial or national origin discrimination. Nor will the evidence support a conclusion that Skulsky changed his vote in order to deprive plaintiff of the opportunity of making a fuller submission to T & P or of depriving plaintiff's supporters from marshaling support for him by lulling them into thinking that plaintiff had the recommendation of his department. Plaintiff did not know at the time his case was first considered by the English Department whether he would or would not have their recommendation. It is to be expected that the case he presented to the Department originally was the best he could present. The method of reconsidering plaintiff's case, though subject to criticism, was nevertheless a permissible resolution of a problem for which no perfect solution was available. There has been no showing that the reconsideration was structured as it was in order to deny plaintiff tenure, much less in order to deny him tenure on account of his race or national origin.

Plaintiff's argument that even if not granted tenure he should have been awarded a long-term contract is without merit. The evidence shows that such contracts were used only in special circumstances, not existing in plaintiff's case, and that in any event Smith was endeavoring during the period of consideration of plaintiff's case to do away with such contracts wherever feasible. Plaintiff has made no showing that he was treated differently from any comparable member of the junior faculty with respect to such long-term nontenure contracts, much less has he made a showing that he was treated differently because of his race or national origin.

### VII. Conclusion

For the foregoing reasons, judgment will be entered for defendants.