**Frieda MASON, Plaintiff-Appellant,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK and Ronald Friedman, Defendants-Appellees.**

No. 81–2893.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 25, 1983.

Decided April 1, 1983.

---

8. The asterisks replace the list of eleven individuals and other gift recipients.

Gregory A. Stayart, Chicago, Ill., for plaintiff-appellant.

James W. Gladden, Jr., Mayer, Brown & Platt, Chicago, Ill., for defendants-appellees.

Before BAUER, CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Frieda Mason, a black employee of the Continental Illinois National Bank in Chicago, brought this suit under the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, against the bank and one of its supervisory employees, complaining that she had been denied promotion because of her race. The district court granted summary judgment in favor of the defendants, and she appeals.

In August 1980, a position as transmission supervisor on the day shift of the communications section of the bank's international services division—a salary grade 9 position—opened up, and Miss Mason, a work coordinator in the section's night shift, applied for it. At about this time she received her annual employee fitness rating, in which she was found by her supervisor to be above average, though not outstanding, and in terms of potential for future development "moderate," defined to mean that "the employee has the ability to advance one salary grade within the next 12 months." The report commented, "With further development for Management interface, Frieda could certainly advance one salary grade in the next 12 months." Mason's supervisor explained that "Management interface" meant communicating with superiors and that defendant Friedman, who was a couple of supervisory levels above Mason, did not like the way she came to him directly with personnel matters rather than going through channels.

Mason's name was forwarded to Dennis Parenti, the supervisor of the communications section, along with the name of another candidate, a white woman. Parenti discussed the names with Friedman, the assistant manager of the international services division, and with Edward Lehmann, the manager of the division. Lehmann stated in his deposition: "I indicated to him [Parenti] that we should try to determine whether or not there might be any other candidates within [the international services division], and also with discussing that with Ron [Friedman] to determine whether there had been any candidates that we might know of that might be appropriate candidates that we might want to consider for this position."

Coincidentally, within a few days of Lehmann's discussion with Parenti an employee in the international services division who had just resigned (effective July 31)—Maryann Yarmolchuk—called Parenti to say she regretted her decision to leave and wanted to come back. Miss Yarmolchuk had been a special investigator for the division, salary grade 8, assigned to handle claims against customers who had underpaid for the bank's services. Her most recent employee rating, in March 1980, had rated her outstanding—a grade above Mason—but like Mason capable of advancing just one salary grade in the next 12 months. Yarmolchuk's termination notice, issued in July, had described her performance as "exemplary in every regard" and had upgraded her potential for future development from "moderate" to "substantial," which means the employee can advance two or more salary grades within the next 24 months. When Parenti learned that Yarmolchuk wanted to come back to the bank he called Friedman, who called Lehmann, and she was appointed to fill the position for which Mason had applied.

Nothing in the facts recited so far suggests that racial animus played any role in the bank's decision to appoint Yarmolchuk rather than Mason to the open position on the day shift. True, Mason's work as a work coordinator on the night shift about the communications section was more like that of a transmission supervisor on the day shift than Yarmolchuk's work as an investigator was, but offsetting this was the fact that before the position on the day shift opened up Yarmolchuk had received two evaluations superior to Mason's. The reference to Mason's problem of "Management interface," in a rating issued the same month the position opened up, implied that she was not thought ready—even by a sympathetic supervisor (also black) who provided deposition evidence for her in this case—for immediate promotion. Yarmolchuk's rating of "moderate" potential had been issued four months earlier and had been upgraded to "substantial" just before the position opened up, suggesting she was riper for promotion than Mason.

Mason contends, however, that the following circumstances created a genuine issue of material fact regarding the bank's true motive for not appointing her, and thus made summary judgment improper:

1. In August she had been given new duties as work coordinator on the night shift, but her position was not upgraded to a grade 9.

2. The bank refused to explain to her in writing why she did not get the appointment as transmission supervisor on the day shift.

3. Friedman told her that Yarmolchuk had been appointed not because she was better qualified but because Mason "lacked communication skills"—an obvious falsehood, according to Mason's brief.

4. Yarmolchuk was not selected for the position until Lehmann, the manager of the international services division, was away on a business trip.

5. Under the bank's rules, existing employees are entitled to a preference when it comes to filling an open position, and Mason was an existing employee, whereas Yarmolchuk, having left the bank, was a new employee.

6. The opening was not posted.

7. Mason's supervisor was not consulted in the appointment.

8. Although under the bank's rules promotion is permissible as soon as an employee is minimally qualified, Mason was denied a promotion because she was not the best qualified candidate.

Neither singly nor in combination do these allegations raise an inference of racial discrimination.

1. There were two transmission supervisors on the day shift but only one on the night shift—Mason's immediate superior. This is because the day shift has more work; there is no incoming, only outgoing, cable traffic on the night shift. If Mason had been upgraded to a transmission supervisor on the night shift, the night shift would have had the same number of transmission supervisors as the day shift, and it did not need so many.

2. The bank's consistent policy is not to give employees written explanations for decisions not to promote. There is no indication of any racial animus behind this policy.

3. Mason's employee evaluation stated that she "had sought help to enhance her writing capabilities," and it is possible that this is what Friedman was referring to in commenting on her lack of communication skills; alternatively, he may have been alluding to her need for "further development for Management interface." In either case Friedman was simply noting acknowledged areas of weakness that would have entered into any comparison of Mason and Yarmolchuk.

4. Friedman phoned Lehmann for approval to appoint Yarmolchuk because Lehmann was traveling on business. There is no indication that this is an abnormal method of making personnel decisions at the Continental Bank.

5. The uncontested deposition evidence is that Yarmolchuk was considered an existing employee, within the spirit if not the letter of the bank's rules, rather than a new employee, because she had left the bank only weeks before and had promptly regretted her decision to leave. There is no suggestion that she was treated differently from the way any other employee, black or white, who had left so recently would have been treated.

6. Openings are not posted when they are filled from within the division; Yarmolchuk was, as we have said, regarded as still being an employee in the division.

7. Mason's supervisor *was* consulted about the vacancy on the day shift—her deposition states this clearly.

8. There is substantial doubt that Mason was qualified for the position she sought, in view of the reservations in her employee fitness rating report made immediately prior to her application. But if she was qualified, still nothing in the bank's rules requires it to promote a minimally qualified employee rather than the most qualified one when a position opens up. No rational enterprise that has several qualified candidates for a position selects among them by lot; it picks the best qualified. Cf. *Holder v. Old Ben Coal Co.,* 618 F.2d 1198, 1202 (7th Cir.1980).

Thus far we have analyzed the case as if there were no special rules for the proof of an employment discrimination case—as if the question in this case, as in any other case where summary judgment is granted, were simply whether there was a genuine issue of material fact. Our reason for proceeding thus is that although the format that the Supreme Court laid down in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for proving racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964 also has been held applicable to cases brought under 42 U.S.C. § 1981, see *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281 n. 3 (7th Cir.1977), as this case was, there is some question whether the format is appropriate, under either statute, in a case involving appointment or promotion to a position for which there are several candidates.

*McDonnell Douglas* allows a disappointed applicant for employment to establish a prima facie case of unlawful discrimination by proving that he was qualified but was rejected and that "the position remained open and the employer continued to seek appli-

cants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. But in *McDonnell Douglas* the employer had posted openings for a job involving routine mechanical skills—the kind of job that normally is filled on a first-come first-served basis from among the pool of qualified applicants. In such a case refusal to hire a qualified applicant while the openings remain unfilled creates an inference that considerations other than individual merit are influencing the hiring process. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–2950, 57 L.Ed.2d 957 (1978). But when the opening involves a managerial position for which there are several applicants, the employer will naturally be looking for the best qualified applicant rather than a minimally qualified one, and the fact that he turns down the first minimally qualified applicant who shows up, in the hope that a better qualified one will appear soon, does not create an inference of discrimination.

The Supreme Court in *Furnco*—which like *McDonnell Douglas* involved jobs demanding only routine skills (bricklaying, in *Furnco*)—indicated that the method of proof set forth in *McDonnell Douglas* might not be applicable to a different type of case. "The central focus of the inquiry ... is always whether the employer is treating 'some people less favorably than others because of their race ....' The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." 438 U.S. at 577, 99 S.Ct. at 2949–2950 (citation omitted). Thus, the method set forth in *McDonnell Douglas* is only a "suggested" aid in reaching judgment on the "critical question of discrimination," and is based on a common-sense notion that certain conduct, if not explained, is probably based on discrimination. If the conduct is not present, the method is inapplicable.

A year after *Furnco* the First Circuit questioned the universality of the *McDonnell Douglas* approach, and in particular its applicability to a case such as this. "In view of the fact that the Court has never passed on the viability of the particular elements of the *McDonnell Douglas* prima facie case outside the factory hiring setting, we caution against automatic reliance on those elements when the employment setting is such that their proof does not make discrimination a probability. For example, if a qualified black were turned down for a job for which there were 100 applicants for every opening and the practice, rather than being to hire the first qualified applicant who appeared, was to choose on the basis of qualifications, recommendations and subjective impressions gleaned from an interview, it would hardly seem 'more likely than not' that the applicant was rejected because of race." *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017 n. 18 (1st Cir.1979). See also *Banerjee v. Board of Trustees of Smith College,* 495 F.Supp. 1148, 1152–55 (D.Mass.1980). Along the same lines, the Supreme Court stated recently in a sex discrimination case (but with equal application, it would seem, to a case of racial discrimination) that "the plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected *under circumstances which give rise to an inference of unlawful discrimination.*" *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (emphasis added). There are no such circumstances in this case.

On the other hand, a panel of this court in a post-*Furnco* decision, *Davis v. Weidner,* 596 F.2d 726, 730 (7th Cir.1979), rejected an argument that the *McDonnell Douglas* format is inapplicable in comparative-evaluation cases, and though the panel did not have the benefit of the *Loeb* decision, which was handed down a few months later, several post-*Loeb* cases in other circuits are

consistent with *Davis.* See, e.g., *Satz v. ITT Financial Corp.,* 619 F.2d 738, 745 n. 13 (8th Cir.1980); *Garner v. Boorstin,* 690 F.2d 1034 (D.C.Cir.1982) (per curiam). There is also *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam), to be reckoned with, where the Supreme Court assumed the applicability of *McDonnell Douglas* in an academic promotion case, though without discussion of the question.

■ While as indicated we share the doubts of the First Circuit whether *McDonnell Douglas* really is applicable in a case such as this, where there is more than one applicant for a job and the job does not involve routine skills, there is no need for us to resolve the question here; our conclusion that Miss Mason is not entitled to a trial on the charges in her complaint would not be changed by applying the *McDonnell Douglas* test—though not because there is a question whether, in view of Mason's recent employee fitness rating, she really was qualified for the position of transmission supervisor. That issue cannot be decided on summary judgment. When she applied for the position she was not told she was unqualified; and though Lehmann did tell his subordinates to keep looking, he may have done this in the hope of getting a richer pool of candidates from which to choose rather than because he considered Mason or the other woman who had applied unqualified. Maybe if Yarmolchuk had not providentially reappeared, Mason would have been appointed after all.

■ But if we assume therefore that Mason did establish a prima facie case of discrimination under *McDonnell Douglas* merely by showing that she was qualified and was rejected, still the prima facie case would be rebutted by "evidence that the plaintiff was rejected, or someone else preferred, for a legitimate nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094. Since there was extensive evidence that Yarmolchuk was preferred for reasons having nothing to do with her race, any presumption of discrimination falls by the wayside. This is so even if Yarmolchuk was not really more qualified than Mason, so long as she was not less qualified. "[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicant does not in itself expose him to" liability. *Id.* at 259, 101 S.Ct. at 1097. "Title VII [and equally 42 U.S.C. § 1981] does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory." *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980) (Friendly, J.). See also *Knight v. Nassau Cty. Civil Service Comm'n,* 649 F.2d 157, 161 (2d Cir. 1981).

■ Therefore Mason cannot use a presumption to help her prove discrimination, but must prove it "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. This brings us right back to the eight circumstances that Mason contends create a genuine issue of material fact regarding the bank's motive in appointing Yarmolchuk instead of her. They no more show that the bank's stated reasons for preferring Yarmolchuk were phony ("pretextual")—the issue when the case is framed in *McDonnell Douglas* terms—than they show discriminatory motive directly. Of course, to be entitled to summary judgment the defendants had to show that on the basis of the evidence obtained in pretrial discovery there was no reasonable possibility of the plaintiff's proving at trial that the reasons the defendants gave for rejecting her in favor of Miss Yarmolchuk were mere pretexts, the real reason being race; but we think the defendants carried their burden. It is not the law that if two candidates for a position, a white and a

black, are qualified, and the white gets the position, the black is entitled to a trial on a complaint of discrimination merely because the reasons given by the employer for appointing the white *might* be phony ones.

It is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained. Since extensive pretrial discovery has revealed no evidence, direct or indirect, that racial animus played any role in Mason's being denied the promotion she sought, her case consists entirely of "mere conclusory assertions of discrimination," which "are not sufficient to withstand a motion for summary judgment ...." *Patterson v. General Motors Corp.,* 631 F.2d 476, 482 (7th Cir.1980). The judgment dismissing the complaint is therefore

AFFIRMED.

CUDAHY, Circuit Judge, concurring:

I agree with the result and with a good deal of the majority's analysis. I write separately in order to comment on the majority's discussion of the appropriateness of the *McDonnell Douglas* analysis in a case such as this. *McDonnell Douglas* in its original form may require some adjustment to fit the facts before us. But there is substantial precedent, both in this and other circuits, as well as indirect indications from the Supreme Court, that *McDonnell Douglas* provides the basic form of analysis which is to be applied in cases involving promotions to jobs where the criteria may be somewhat subjective and the evaluation comparative in nature. *See, e.g., Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *on remand, Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1st Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); *Davis v. Weidner,* 596 F.2d 726 (7th Cir. 1979); *Wright v. National Archives and Records Service,* 609 F.2d 702, 713–15 (4th Cir.1979); *Satz v. ITT Financial Corp.,* 619 F.2d 738, 745 n. 13 (8th Cir.1980). Racial discrimination is frequently so difficult a phenomenon to prove or disprove that drift-

ing from the settled landmarks, such as *McDonnell Douglas,* may be fraught with danger. And to be too demanding of the inferences we draw from common experience is to make proof of discrimination more elusive than it is under the best of circumstances.

In the instant case, there is sufficient evidence that Mason was "qualified," and there is some evidence that she was "in line" for the promotion; thus a prima facie case under *McDonnell Douglas* seems to have been presented. Had Mason also presented evidence of facts which could be proved at trial to establish that the legitimate nondiscriminatory reason articulated by the employer for its decision was pretextual, her case could have escaped summary judgment. But evidence of pretext here is difficult to identify.

Cases turning upon subjective considerations of motive and intent are not ordinarily appropriate for decision upon summary judgment. *See, e.g., Baldini v. Local 1095, UAW,* 581 F.2d 145, 151 (7th Cir.1978). And plaintiffs should not be deprived by summary judgment of a "full and fair opportunity to demonstrate pretext." *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.,* 690 F.2d 88, 97 (6th Cir.1982); *see also Davis v. Weidner,* 596 F.2d at 732, quoting *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825–1826. Yet, despite fairly extensive pre-trial discovery in this case, in order to discern evidence of racial discrimination underlying the employer's articulated nondiscriminatory reason, we would have to speculate. This we cannot do.

Therefore I concur.