Edwin K. MARSON, Plaintiff,

v.

JONES & LAUGHLIN STEEL CORPORATION, Defendant.

Civ. A. No. 76-C-493.

United States District Court,
E. D. Wisconsin.

Oct. 6, 1981.

---

Ross R. Kinney, Quarles & Brady, Milwaukee, Wis., for plaintiff.

Ralph A. Morris, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## DECISION AND ORDER

TERENCE T. EVANS, District Judge.

This five-year-old case was tried to the court for seven days concluding on September 29, 1981. After entertaining oral arguments, I took the matter under advisement. The following constitutes my decision.

The plaintiff, Edwin K. Marson, alleges that the defendant Jones & Laughlin Steel Corporation, wilfully discriminated against him in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* Jones & Laughlin denies the plaintiff's allegations of discrimination.

Mr. Marson was born September 13, 1931. After working several years for United States Steel, Marson, at age 36, joined Jones & Laughlin in 1967 as a salesman. Marson was assigned to the Milwaukee mill district sales office, where he worked until January 1, 1975, when he was transferred to the defendant's Chicago Steel service center. At the time of the transfer, Marson was purchasing a home in Brookfield, a Milwaukee suburb. He also had children in area schools and a wife employed at a local hospital.

Marson saw his transfer to Chicago as an unfair demotion. In his view, being a service center salesman was less prestigious than being a mill salesman. He felt that if a Milwaukee mill salesman had to be transferred to Chicago it should have been a "beginner" salesman recently assigned to the Milwaukee office.

The transfer caused a personal crisis for Marson. His wife was reluctant to leave her job and his daughter did not want to leave her high school friends. He was also concerned about changing homes because his Milwaukee mortgage was at an interest rate much lower than the prevailing rate. As a result of these personal concerns, Mr. Marson attempted to commute to his new sales area, a northern Illinois territory stretching from the city of Chicago to the Wisconsin border, rather than uproot his family and move from Milwaukee.

On July 31, 1975, six months after he was transferred to Chicago, Marson was permanently laid off from Jones & Laughlin. The layoff came during a recession-induced force reduction at the company. Marson was 43 years old at the time of the layoff.

Marson views his transfer and subsequent layoff as caused by what he calls "age and age euphemisms." "Age euphemisms" are said to be his high salary, his not yet vested pension rights and Jones & Laughlin's Management Development Program. In short, he claims that Jones & Laughlin saved money by getting rid of him and instead retaining younger, less experienced salesmen. This practice, Marson claims, discriminated against him due to his age because he was more expensive to Jones & Laughlin. As to the Management Development Program, he theorizes that it causes the elimination of older employees who are tagged, as he claims he was, as non-management material.

As a result of these concerns, Marson views this case broadly as a "wholesale assault" on a system which discriminates against older, more expensive employees. I decline Mr. Marson's invitation to view the case as broadly as he suggests because I see it quite differently than he does.

The Court of Appeals for this circuit has relied on an analogy with Title VII cases for the order and burden of proof to be applied in age discrimination cases.[1] *Kephart v. Institute of Gas Technology*, 630 F.2d 1217 (7th Cir., 1980). Plaintiff must first establish a *prima facie* case of discrimination. If plaintiff succeeds, a defendant must "articulate" the reasons for its decision. Next, plaintiff must show that the articulated reasons are a pretext for discrimination. Despite these shifts, the plaintiff retains the burden of proof throughout the trial.

In an ADEA case, the plaintiff must prove that he was a member of the protected class, i. e.,—a person between 40 and 65 years of age;[2] that he was affected adversely by an employment decision; that he was qualified for the job; and that he was replaced by a person outside the protected group. Age does not have to be the sole reason for a discharge, but it must be a contributing factor. *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975). *Kephart, supra.* As plaintiff phrases it, it must be a "determinative 'but for' factor" in the discharge.

Marson attempts to establish his *prima facie* case by piecing together a number of

---

1. The analogy, relying on the race discrimination formula in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), may be suspect in force reduction cases under the ADEA because one of the elements, i. e., replacement by a younger worker may be impossible to prove. As the Fifth Circuit Court of Appeals recently noted, a better *prima facie* formula in a job reduction ADEA case is: (1) the plaintiff was within the protected age group and was adversely affected—discharged or demoted—by the employer's employment decision; (2) the plaintiff was qualified to assume another position; and (3) the employer intended to discriminate in reaching the decision at issue. *Williams v. General Motors*, 656 F.2d 120 (5th Cir. 1981).

The *Williams* formula is better suited to ADEA job reduction cases, and would make more sense in reviewing the claim presented by Mr. Marson than the formula in use in this district. *Williams* recognizes that age simply should be a neutral factor entitling the employee to no special treatment, either discriminatorily or preferentially. Had I used the *Williams* formula, the result of this case would still, however, be the same.

2. The ADEA was amended effective January 1, 1979, extending its coverage to age 70. 29 U.S.C. § 631.

patches in which he sees a discriminatory pattern; however, he fails to make the pattern visible to me. Plaintiff states that the very fact that he was sent to Chicago rather than some other city shows that Jones & Laughlin was trying to force him to quit. He claims that during the interview process in 1967, he told the interviewer, a Mr. Timberlake, that he would go anywhere but New York or Chicago. Thus, Marson sees the choice of Chicago as a direct attempt to make him quit. At least two things prevent this fact from helping Marson establish his case. First, the interview was eight years prior to the transfer. To assume that anyone in the company remembered what one of their salesmen said about location that long before the transfer is, in my view, highly unlikely. This is especially so when one considers that Mr. Timberlake left Jones & Laughlin in 1968. Secondly, even if the company was attempting by this ploy to get rid of Marson, that fact alone does not establish that they were doing it *because* of his age.

Marson also makes much of the fact that it would have been easier for a new Milwaukee salesman, a Mr. Carleton, to transfer. Presumably, in Marson's view, Carleton did not yet have roots established in Milwaukee. Also, in Marson's view, Carleton was not as good a salesman as he was. That the company chose Marson for the transfer rather than Carleton, however, was, in my judgment, a business decision justified by several factors. The decision was not made because of Mr. Marson's age.

Marson also argues that the fact that he was given a "bad" territory upon his transfer supports his claim of age discrimination. It ensured, he argues, that he would not perform well.

The territory assigned to Marson out of the Chicago office was one which had not been heavily worked in the past and was largely made up of light industry rather than the heavy industry for which large steel purchases were necessary. That Marson was given this territory is also, in my judgment, justified by valid business reasons.

Marson claims that his superiors, especially Cecil Jones, always told him he was an excellent salesman. He claims that he was told that he was better than the company's written evaluations of him show. The evaluations show that he was rated C, which would indicate adequate performance.

Marson, in short, sees the entire incident, his transfer to a city he had told Jones & Laughlin he didn't want to work in, his being given a "bad" territory, his "predictable" low performance in that territory, and his subsequent "layoff," as a plot engineered to get rid of him all because of his large salary, the fact that his pension would soon vest, and the fact that he was rated as non-management material. Marson has not convinced me that the company was trying to eliminate him. But even if it was, Marson has failed to establish to my satisfaction a link between Jones & Laughlin's trying to get him to quit and any sort of age discrimination.

Because Jones & Laughlin was involved in 1975 in a force reduction, the layoff can easily be seen as justified by economic factors entirely unrelated to Marson's age. See *Sahadi v. Reynolds Chemical*, 636 F.2d 1116 (6th Cir. 1980), in which Sahadi was laid off during an economic cutback. There, the court stated that the company was under no duty to transfer plaintiff to another plant and to discharge a different person. The court noted that "the question was not whether plaintiff was treated fairly but whether discrimination occurred."

As stated above, Marson attempts to establish the link between his transfer-termination and age discrimination by the fact that he was making what he refers to as a large salary and because his pension had not vested. Thus, he claims, cost savings to the company (an "age euphemism") were a guise for age discrimination.

True, the company was interested in the benefits due terminated employees. However, of 275 salaried employees terminated in the July, 1975 force reduction, 135 were eligible for immediate pensions and 15 for deferred pensions. Over half of those terminated had vested pensions. Plaintiff's

pension argument cannot be sustained. At the very least, it does not prove what Marson claims.

As to Marson's salary, it is not so high as to constitute a convincing reason for termination. In 1975, Marson earned $24,223. per year. It is hard to believe that Jones & Laughlin would lay off a truly effective salesman—that is, one bringing in thousands of dollars in business—because of a $24,000. salary. In this regard, I find persuasive the statement of Gerald Hart—that in the steel business, salaries such as Marson was drawing, are basically irrelevant. While this may be true, it should also be noted that if a person were being paid more than others in comparison to his sales, that could be a reason for termination. But it would not—in and of itself—be age discrimination.

Marson also relies on documents which reveal that Jones & Laughlin was concerned about legal liability resulting from the 1975 layoffs. Jones & Laughlin was concerned about the Age Discrimination Act and considered its impact prior to taking action. However, that Jones & Laughlin wanted to avoid liability does not prove that it wanted to discriminate against Marson on the basis of age without getting caught. It is natural and expected that a company will be aware of acts such as the ADEA and will discuss the law and even court decisions when discharging employees. The fact that it does so does not prove discrimination.

Marson also questions Jones & Laughlin's Management Development Program, the one in which he was apparently rated as non-management material. The implication seems to be that because a senior salesman—the highest sales position—is set forth in the job description as being for persons from 35–45 years of age, all persons who were expected to rise no higher in the company than senior salesmen would be terminated before age 45. Countless documents in the record show that many salesmen were over 45. The fact that Marson may have been rated as non-management material does not prove that the program was infested with age discrimination.

Plaintiff's experts—viewing the world as Marson did—all, of course, see age discrimination in his transfer and termination. Their conclusions, however, rest on their unquestioning acceptance of Marson's interpretation of the evidence, interpretations I find to be without merit.

Certain of plaintiff's experts find fault with Jones & Laughlin job evaluations. For instance, Dr. Joel Lefkowitz stated that the Jones & Laughlin evaluations lacked "job relatedness." However, Jones & Laughlin can lawfully use any instruments it chooses to evaluate employees. What it cannot do is discriminate. The experts, including Dr. Lefkowitz, do not state nor would I find, that Jones & Laughlin's evaluations are geared to justify discrimination. Therefore, that they may be faulty or a bit casual in the eyes of academic experts in employee evaluations is without significance.

■ In short, plaintiff has failed to establish a *prima facie* case. He has failed to show that he was qualified for the job to the point where he could not, under the economic circumstances that existed in late 1974 and 1975, be terminated.

■ Even assuming that Marson established a *prima facie* case, however, Jones & Laughlin has "articulated" a non-discriminatory reason for the termination. Jones & Laughlin made a decision to implement a force reduction because of economic conditions. The Chicago service center reduced its workforce by two persons. One man volunteered to retire. Mr. Robert Wood, the sales supervisor, evaluated his salesmen and determined that the second man to leave would be Marson. Wood's reasons for choosing Marson were that Marson's attitude was bad and his performance was low.

Several factors, in Wood's view, revealed Marson's bad attitude. The first was that Marson was impatient with the training program which Wood had arranged for him when he arrived at the service center. Wood thought that the difference between mill and service center sales was great

enough to require retraining. After one week of three weeks' of planned training, Marson said that the training was a waste of time and that he wanted to get out and sell. Wood thought Marson needed more training, but let him go. Another factor was that Marson was critical of Jones & Laughlin management, both in Milwaukee and at the Chicago service center. Marson had, in fact, expressed criticism of the company to one of his customers, Mr. Ken Foy of International Harvestor.

Marson's attitude that the transfer was a humiliation seemed inappropriate to Wood. Marson felt that the service centers were the "minor leagues." Wood himself had been transferred from a position as sales manager of mill sales in Pennsylvania to the service center in Chicago. He claimed he accepted his transfer to improve his chances at a management position. He thought it was a good opportunity. His transfer was part of a cross-fertilization program begun in the early '70's between the mills and the service centers. Marson's opinion that the transfer to a service center was a humiliating demotion showed to Mr. Wood an inflexibility on Marson's part.

As to Marson's performance, Wood said it was minimal. Marson claims his performance reflected the bad territory which he was given. Wood, however, states that three territories were potentially available when Marson arrived in Chicago. One was in the Chicago Loop area, another around Fort Wayne, Indiana, and the third the northern Illinois territory which Marson was given. The northern Illinois territory was given to Marson to accommodate him because of his reluctance to move from Milwaukee.

Marson brought in six new accounts while he worked in his territory. However, Wood stated that they were very minimal—one ton of business altogether. Wood said Marson was his least effective salesman—regardless of rank, experience, or salary.

Further undermining Marson's claim of age discrimination, five salesmen older than Marson were retained—one born in 1917, two in 1920, one in 1925, and one in 1927.

Jones & Laughlin has also articulated a non-discriminatory reason for Marson's transfer to Chicago. The company has moved to strike allegations regarding the transfer because of Marson's failure to meet jurisdictional time limits under the ADEA. The evidence Marson offered regarding the transfer was admitted at trial as part of his entire view of the events surrounding his termination. Because that evidence was admitted, Jones & Laughlin has responded.

Jones & Laughlin witnesses testified that the cross-fertilization program between the mills and the service centers was in existence. David Alexy gave Robert Huenefeld a list of people whom the mill could not keep and who could be transferred to the service centers. Mr. Huenefeld assigned those persons, including Marson, based on geographic considerations. He tried not to move people too far. Huenefeld, I find, did not know that Marson had told Timberlake eight years earlier that he did not want to work in Chicago.

The seven salesmen transferred were all given a $100. per month increase in salary as an incentive. Five of those transferred, including Marson, had been with Jones & Laughlin for approximately seven years. The other two salesmen transferred had been with the company for twelve and sixteen years. One of those transferred was 57 years old, Marson was 43, one was 37, and the other four were between 30 and 32 years of age. All were transferred to service centers reasonably close to the district sales offices they had worked in. Considering the moving costs and economic factors involved it is, in my judgment, somewhat absurd to view Marson's transfer as part of a grandiose scenario orchestrated by Jones & Laughlin to get rid of Marson because of his age.

In conclusion, I find that Jones & Laughlin's justifications for permanently laying off Marson were not a pretext for covering up discrimination. Mr. Marson's age was not, in my judgment, a factor in either his transfer or layoff.

For the reasons stated above, the complaint is dismissed. Judgment of dismissal in favor of the defendant with costs is ordered.