Robert S. WEIDMAN, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., Defendant.

No. C–78–459–WS.

United States District Court, M. D. North Carolina, Winston-Salem Division.

Dec. 3, 1981.

William G. Pfefferkorn, Jim D. Cooley, J. Wilson Parker and David C. Pishko, Winston-Salem, N. C., for plaintiff.

Scott Forman and John F. Goemaat, Greensboro, N. C., for defendant.

## MEMORANDUM OPINION

ERWIN, District Judge.

Robert Weidman, the plaintiff, is a former employee of Western Electric Company who was retired on October 16, 1976. He contends that he was forced to retire during a reduction in the work force and that his retirement was in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (ADEA). Western Electric contends that the plaintiff's age was not a factor in his selection for termination. It also claims that the plaintiff was retired pursuant to a bona fide pension plan.[1]

The case was tried before a jury on September 8 and 9, 1981. At the close of all the evidence, the defendant moved for a directed verdict in its favor. The Court has

---

1. In addition, defendant contended that plaintiff failed to file a timely notice of intent to bring this action with the Secretary of Labor, and that he failed to meet the statute of limitations. The Court has ruled that the notice was timely and that the plaintiff is not barred by the applicable statute of limitations.

searched the record for any possible evidence of age discrimination and giving the plaintiff the benefit of every reasonable inference to be derived from the evidence, the Court finds that the jury could not reasonably decide for the plaintiff. For the reasons set forth below, the Court grants the defendant's motion.

### Facts

Robert S. Weidman was born on July 18, 1917 and worked for Western Electric as an engineer from October 1, 1956 to October 15, 1976. He was retired at company initiative effective October 16, 1976, and the reason given by the company was "lack of work." At the time of his retirement, the plaintiff received a termination allowance of $12,731.55. He has received monthly pension benefits since that time (OFPC–¶ 6(a), (b), (e), (h), and (i)).[2]

Mr. Weidman's retirement was authorized by Western Electric's pension plan. That plan has, since January 1, 1913, authorized retirement at company initiative for employees who are pension eligible. The plaintiff was eligible for retirement since he was over age fifty-five and had twenty years service with the company on October 1, 1976. Individuals who had reached that age and had that amount of service were made eligible for a retirement pension by an October 1, 1971 amendment to the pension plan (OFPC–¶ 6(f), (g)). The purpose of this amendment was to equalize the pension benefits of men and women. Prior to 1971, women had been eligible for a pension at a younger age and with less service than men. As a result of collective bargaining in 1971, the pension benefits of men were increased to that of women, and the company followed its practice of giving benefit improvements negotiated for its union represented employees to unrepresented employees such as the plaintiff (T–234, 235).

Throughout his career with Western Electric, the plaintiff was employed at the North Carolina Works, which consisted of plants in Burlington, Greensboro, and Winston-Salem, North Carolina. These plants produced electronic equipment for the federal government and for telephone companies. In late 1972, the North Carolina Works began to experience economic difficulties. A reduction in government contracts caused a loss of work at the Burlington plant, and Western Electric compensated for this by shifting some of the telephone work from Winston-Salem to Burlington. In 1974, however, the telephone work began to deteriorate, and in 1975, the company experienced a reduction in work equaling $791,000,000 (T–149).

This reduction resulted in the layoff of a number of employees. The number of employees at the North Carolina Works dropped from 8,498 to 4,927 between the years 1974 and 1977. In the plaintiff's category, occupational engineer, the work force declined from 328 to 80 between the years 1972 and 1977[3] (DX–9). Thus, the total number of employees was reduced by about forty percent, and the number of occupational engineers was reduced by seventy-five percent.

The number of employees who would be affected by the reduction in force was determined based on budget forecasts. These forecasts determined the amount of production and, therefore, the number of production employees required. The company calls these production workers "direct" employees. The forecasts also determined the number of support personnel, such as accountants, personnel staff, and engineers, such as plaintiff, whose salaries could be paid based on the level of production. The support personnel are called "expense employees." The budget was then based on what the company calls an "expense to direct ratio." When the number of "direct"

---

**2.** The following abbreviations are used herein: "OFPC" for Order on Final Pre-Trial Conference; "PX" for plaintiff's exhibits; "DX" for defendant's exhibits; and "T" for transcript references.

**3.** The reduction in force affected the entire company, the total work force declining from over 206,000 to 151,000. The number of occupational engineers was reduced from 5,641 to 3,421 (DX–6).

employees was reduced due to a lower level of production, then the number of "expense" employees was reduced in accord with the ratio (T–155).

The reduction in force, as it affected employees in the plaintiff's job classification, was carried out under instructions issued by the defendant's personnel administration. The general instruction was entitled "Policy Guide, Force Reductions—Other Than Hourly Rated Employees" (DX–7). This instruction required that employees be identified for layoff on the basis of "ability, performance, term of employment, and the needs of the business" (DX–7, ¶ 1.07). The Policy Guide also required that it be applied without regard to age (DX–7, ¶ 1.03).

Supplemental instructions were also issued to cover the force reduction which affected the plaintiff. These instructions were in a June 20, 1975 letter from the general personnel director to the general manager of the North Carolina Works (DX–8). These instructions required that employees in each "universe," such as professional engineers, be arranged in bands based on demonstrable differences in performance. Employees in each band were to be arranged in order of service. Action was to be taken to reduce an employee surplus starting with the lowest service employee in the lowest performance band. An employee subject to layoff but who was either within twelve months of pension eligibility or six months of a vested pension was not to be laid off until such eligibility was reached.[4]

In the plaintiff's case, the "universe" was composed of senior and occupational engineers in the industrial engineering organization[5] (PX–1). This group was divided into seven performance bands, and the plaintiff was placed in the second from the lowest band. Everyone in the three lowest bands was affected by the reduction in force.

The only direct evidence on the development of these performance bands was provided by the plaintiff's immediate supervisor, Henry Van Hoy.[6] He testified that the bands were developed from the latest performance rank ordering of engineers that had been done for salary purposes and that consideration was given to service with Western Electric (T–206). Mr. Van Hoy also testified that the age of the engineers was not considered (T–207, 208).

There was no evidence that a disproportionately large number of older engineers were placed in the lower performance categories. Nor was there any evidence adduced of any significant disparity between the number of older engineers in the work force and the number affected by the reduction in force. The plaintiff listed a number of retirement eligible engineers who were retired at the initiative of the company (PX–7). There were, however, a number of retirement eligible engineers who were not retired during this period and a number of younger engineers who were laid off (PX–4, 5, 6; T–74 to 86). The only evidence comparing the work force before and after the reduction in force indicated that the percentage of older employees increased as the reduction progressed. This held true for both the entire North Carolina Works and for the plaintiff's occupational engineer category (DX–10).

No evidence was presented to indicate that less qualified engineers were treated better than the plaintiff in the reduction in force. From 1961 to 1972, the plaintiff's performance was rated in the bottom twenty-five percent (DX–1). In 1973, his de-

---

4. Mr. Weidman's termination was delayed for a year by this policy, and he received a pension rather than being laid off. He was actually held on the job for more than a year by his supervisor who allowed him to stay for three months so that he could come within a year of pension eligibility (T–28, 30, 69, 71, 72, 204, 205).

5. Senior engineers are individuals who, during their careers as occupational engineers, received at least two top performance ratings. This is the minimum necessary for promotion to the higher paid senior level.

6. Mr. Van Hoy headed the training department in the industrial engineering organization. The performance bands were developed jointly by all department heads in industrial engineering.

partment chief, M. H. Hoyle, Jr., rated him a "marginal" employee. This rating meant that the plaintiff's performance would have to improve or he would be subject to termination (T–191). In order to give him an opportunity to improve his performance, the plaintiff was given a probationary transfer to the training organization supervised by Mr. Van Hoy (DX–12). There plaintiff's performance rating was changed to "good" after he showed progress in reaching specific goals which Mr. Van Hoy had set.[7] This rating saved the plaintiff from termination due to performance (T–22, 202, DX–64). In a comparison to other engineers, however, the plaintiff remained a lower rated performer. As a matter of fact, he was rated at the bottom of the group (T–179).

All engineers whom the defendant considered equal to or worse than the plaintiff in performance were affected by the reduction in force. Four engineers in their late twenties whose performance was considered better than that of the plaintiff were laid off in May and August 1975. D. E. Gound, a younger engineer whose performance was considered similar to the plaintiff's performance transferred to the defendant's Richmond plant (PX–1). This transfer, however, was over four months before plaintiff even sought transfer to avoid termination (T–102). There is no evidence that the plaintiff attempted to transfer to the job that Gound took in Richmond.

During the course of the trial, plaintiff referred to other employees of the defendant who were younger than himself, but were not terminated during the force reduction. These persons, however, were either better qualified than plaintiff or were not in the same personnel "universe."

7. Under the rating system instituted by the defendant in 1974, the "good" category constituted seventy-five percent of the employees, and it was the lowest acceptable rating (T–144).

8. The plaintiff argues that his exhibit showing the number of pension eligible occupational engineers who were retired raises an inference of discrimination (PX–7). The Court, however, could not submit the case to the jury on this

*Discussion*

For purposes of the defendant's motion, the Court must decide whether there is any evidence in the record through which the plaintiff could reasonably meet his burden of raising an inference of discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, 25 EPD ¶ 31,544 (1981). There being no direct evidence that plaintiff's age was even considered by the defendant, the Court must look for circumstantial evidence supporting an inference that age was a determining factor in the plaintiff's termination. *Smith v. University of North Carolina*, 632 F.2d 316 (4th Cir. 1980); *Smith v. Flax*, 618 F.2d 1062 (4th Cir. 1980); *Spagnoulo v. Whirlpool Corp.*, 641 F.2d 1109 (4th Cir. 1981).

The evidence regarding the ages of persons affected by the reduction in force raises no inference of discrimination in this case. Since the plaintiff's "universe," for purposes of the reduction, was composed of senior and occupational engineers in industrial engineering, that is the only group from which any reasonable inference could be drawn.[8] The evidence concerning that group shows no significant disparity favoring younger engineers. *See Flax, supra.*

The plaintiff asserts that discrimination can be inferred from his testimony that he had plenty of work to do, and there was, therefore, no reason to terminate him. The only evidence on the procedures for the force reduction, however, indicates that an individual employee's work load was irrelevant because the reduction was based solely on the number of support employees whose salaries could be carried at a reduced level

basis, since it is uncontradicted that the defendant chose those to be terminated from among *all* engineers, not just those in the narrow category described by the plaintiff. Thus, the plaintiff's inference would arise only from an unreasonable distortion of the evidence because the exhibit excludes the pension eligible engineers who were not retired, and the engineers who were not retirement eligible and laid off.

268

of production. Given this lower level of production, the company imposed a reduction in force on the plaintiff's industrial engineering organization. That organization then chose to terminate its poorest performers in the senior and occupational engineer group rather than have each smaller sub-organization, such as the training department, carry out its own reduction. It may be that a different method of implementing the reduction would not have affected the plaintiff. There is no evidence, however, that the company chose the method that it did in order to terminate older employees or that this method had a greater impact on older employees. The plaintiff may disagree with the company's methods, but the Court finds that they were completely reasonable and can find no inference of age discrimination associated with them.

■. The evidence in this case simply does not support an inference of discrimination under the principles of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), or *Burdine, supra.* There is no dispute that the plaintiff was a member of the class protected under ADEA, that he was terminated, and that some younger engineers were not terminated. The Supreme Court has held, however, that an inference of discrimination arises only when the employer's action favors employees who are less qualified than the plaintiff. *Burdine, supra.* In this case, all those considered less qualified than the plaintiff were terminated, as well as some younger engineers who were considered better qualified.[9]

■ The plaintiff argues that the company's retention of D. E. Gound raises an inference of discrimination. The evidence indicates, however, that Gound would have been laid off had he not transferred to the defendant's Richmond plant in February

1975. The plaintiff testified that he was notified in June 1975 that he was subject to termination and that he sought transfer only after that date. He did not, therefore, seek the transfer which Gound accepted. It is not possible to infer discrimination regarding the Gound transfer when there is no evidence that the plaintiff even sought consideration for the same job and where the transfer was so remote in time with regard to his termination. *See Williams v. General Motors Corp.*, 656 F.2d 120 (5th Cir. 1981).

In addition to raising no reasonable inference that age was a determining factor in the defendant's decision to terminate the plaintiff, the evidence also demonstrates that the defendant observed the terms of a bona fide pension plan in retiring the plaintiff. Such an observance provided an exemption under Section 4(f)(2) of ADEA at the time of the plaintiff's retirement. 29 U.S.C. § 623(f)(2) (1976).

■ The parties have stipulated to almost every element of proof which has been held to establish the exemption. A plan is bona fide if it pays benefits. *United Airlines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). An employer observes the terms of the plan if it exercises an option to retire an employee which is authorized by the plan. *EEOC v. B & O Railway Co.*, 632 F.2d 1107 (4th Cir. 1980); *Zinger v. Blanchette*, 549 F.2d 901 (3rd Cir. 1977). These elements are established by the parties' stipulations that the plaintiff was retired under an authorization in the pension plan, that he was paid benefits, and that all pension amounts were properly calculated in accord with the pension plan.

■ A pension plan which is entitled to the Section 4(f)(2) exemption must not be a "subterfuge to evade the purposes" of ADEA. The Supreme Court has defined "subterfuge" for purposes of this statute as a "scheme, plan, strategem, or article of

9. The plaintiff presented testimony from Western Electric engineers who had taken courses he instructed. Neither of these witnesses had supervised the plaintiff, nor were they responsible for determining who should be terminated. Their opinions were, therefore, not relevant. *Flax, supra.*

evasion." *McMann, supra,* 434 U.S. at 203, 98 S.Ct. at 450. Further, the Court held that a pension plan in existence prior to the 1967 enactment of ADEA could not be a subterfuge to evade its purposes. In this case, Western Electric's authority to retire persons who are pension eligible has existed since the pension plan was established in 1913. This authority cannot, therefore, be a subterfuge to evade the purposes of ADEA.

The plaintiff was made eligible for retirement by a 1971 amendment to the pension plan. In *B & O Railroad, supra,* the Fourth Circuit held that an employer which had never had a pension plan provision allowing for involuntary retirement could not lawfully amend its pension plan in the midst of a force reduction after the enactment of ADEA solely to lower the involuntary retirement age. In the present case, there is no evidence that the defendant amended its pension plan in 1971 for these purposes. The only evidence before the Court is that the plan was amended to provide more liberal benefits to men, benefits which previously had been held only by women.

Moreover, it is unreasonable to conclude that an employer would increase pension eligibility and thereby increase both its funding costs and the drain on pension funds in order to evade ADEA. In *B & O Railroad,* the effect of the amendment was to force all employees who were already eligible for a pension out at a younger age with no new pension commitments by the employer. In the present case, the mandatory retirement age was not changed, but the number of employees eligible for a pension was increased, with the attendant increase in funding and benefit obligations. The Court finds no motive to evade ADEA from the evidence here. Under the evidence of this case, it is clear that the plaintiff's pension eligibility status was a factor that prolonged his employment. The defendant actually delayed his termination for over a year until he could become eligible for a pension. That action by the defendant cannot be termed discrimination within the Age Discrimination in Employment Act.

For the reasons expressed above, it is hereby ORDERED that the defendant's motion for a directed verdict is granted.