Dwight E. ROE, Plaintiff,

v.

**INTERNATIONAL HARVESTER CO., Defendant.**

Civ. No. F 83–338.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

June 13, 1984.

Dennis H. Geisleman and William A. Kern, Fort Wayne, Ind., for plaintiff.

Milford M. Miller, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial held from Monday, June 4, 1984 to

Wednesday, June 6, 1984. Plaintiff brought this action under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621, *et seq.*, alleging discrimination in the employment separation practice of the defendant. The court, having examined the entire record and having determined the credibility of the witnesses after viewing their demeanor and considering their interests, hereby renders and enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. Plaintiff, Dwight E. Roe, is a male citizen of the United States of America and the State of Indiana. He was born on April 18, 1931.

2. Defendant, International Harvester Company, is a Delaware corporation admitted to do business in Indiana. At all relevant times, International Harvester operated a manufacturing plant in Fort Wayne, Indiana and was an employer within the meaning of the Age Discrimination in Employment Act, 29 U.S.C. § 630(b).

3. International Harvester, which principally produces trucks and farm implements, is headquartered in Chicago, Illinois. Aside from its Fort Wayne operation, International Harvester had plants in various other locales including a plant in Chatham, Ontario and one in Springfield, Ohio. Those plants and others, to a certain extent, are interdependent because certain parts manufactured at one plant may be utilized elsewhere.

4. The Fort Wayne plant is, as of this date, closed. While still in operation, however, the Fort Wayne plant was a very large operation.

5. Physically, the plant covered 221 acres, 71 of which were under roof. Within the manufacturing compound there was a heavy duty truck plant, an axle and transmission division, and a Scout plant (which produced lighter utility vehicles). The heavy duty truck plant itself had two assembly lines, each of which was 1,662 feet long.

6. While in operation, International Harvester was a large employer in Fort Wayne. In 1978, International Harvester employed 6,498 hourly workers and 641 managerial workers locally and, in 1979, when production was quite high, 1,500 additional workers were employed.

7. Plaintiff was first employed by defendant at its Fort Wayne plant on February 16, 1953 as a sweeper/laborer in the machine shop. In 1964, plaintiff bid into the Inspection Department. Throughout this period plaintiff was an hourly non-management employee.

8. On June 29, 1970, plaintiff became a group leader in Inspection, Department 52. Because that too was an hourly position, plaintiff worked under the supervision of others, performing inspections on one or the other of the two assembly lines in the heavy duty truck plant. Though group leader was an hourly position, plaintiff performed many of the functions of a foreman with the main exception that he had no authority to hire or fire.

9. Plaintiff was promoted to management as a First Line Supervisor in the position Foreman, Inspection on September 2, 1979. Plaintiff's duties as Foreman, Inspection were performed in Department 52 where he had been an hourly rated employee.[1]

10. Plaintiff continued as a managerial employee of defendant until his separation on December 11, 1981. At the time of his separation, plaintiff had approximately 28 years, 10 months' service at International Harvester. Had he remained until February 1983, he would have had 30 years' service and, consequently, would have been entitled to greater pension benefits.

---

1. Actually, Department 52 was comprised of the hourly employees assigned to Inspection in the heavy duty truck plant. Technically, supervisors of Inspection were in Managerial Department 113. For simplicity, the court will refer to Department 52 as if it were comprised of both the hourly and managerial employees in the Inspection Department of the heavy duty truck plant.

11. Management employees at International Harvester have no seniority system. By plaintiff's own testimony, he was aware that managers were not immune to the possibility of layoff or discharge.

12. Employees in Inspection, Department 52 performed many functions. Generally included among those were the following specific tasks:

a) *Time Card Control*—This task required an inspector to schedule hourly employees in recognition of the fact that some employees at a given time would not be there because of illness or leave. It was essential that the inspector doing time card control effectively distribute the available manpower.

b) *Investigate Field Complaints*—When a complaint was received about the performance of a truck, it was necessary to try to pinpoint and isolate any problems which may have occurred so that corrective measures, if any, could be implemented.

c) *Inhouse Campaigns for Production Defects*—Whenever it was discovered that a defective part or procedure had been utilized during the production phase, it became necessary to locate the particular units involved and correct the problem before the truck left the plant.

d) *Maintain Inspection Procedures*—As the name of the function suggests, inspection procedures that were implemented had to be maintained and, if necessary, revised or upgraded in light of the desire to produce a quality truck efficiently.

e) *Perform Process Control Audits*—This task essentially constituted a backup check whereby a foreman in the department would inspect another inspector's individual performance.

f) *Torque Surveillance Audits*—This function required an inspector to check the torque (e.g. tightness) of bolts on various parts of the truck to assure that they were within given specifications.

Occasionally, Inspectors would perform additional tasks including:

g) *Running the Rolls*—This is a functional test of the vehicle—essentially a short run test drive.

h) *Final Sales*—After the truck had been painted, it would be taken to the "quonset" where the vehicle would be run, stopped and then such features as the lights, etc. would be checked.

The foregoing list is not all inclusive nor exclusive with respect to the functions of Inspectors in Department 52. This is so because of the fact that a heavy duty truck is comprised of several thousand basic parts and several thousand more parts in speciality items.

13. Plaintiff could perform all of the foregoing tasks/functions of an Inspector, Department 52 capably. Moreover, plaintiff had a vast technical knowledge with respect to the specifications of heavy duty trucks produced in the Fort Wayne plant.

14. Beginning in 1978, International Harvester experienced a higher than usual demand for both its utility (Scout) vehicles and its heavy duty trucks. On November 1, 1978, the Fort Wayne complex was responsible for the production of 142 heavy duty trucks and 186 utility (Scout) vehicles. By November 13, 1978, the respective figures were 178 heavy duty trucks and 200 Scouts.

15. In response to increasing demands, International Harvester added a second shift to its "B" assembly line on its heavy duty truck line in Fort Wayne.

16. The increasing demand for its product further led defendant to hire new workers (see Finding 6), both managerial and hourly rated (non-managerial) employees, in 1978 and 1979. Further, considering the need for increased managerial employees in Fort Wayne, International Harvester promoted to management positions qualified hourly-rated employees who expressed a desire for a management position.

17. Plaintiff became a managerial employee (Foreman in Inspection, Department 52) at a time when the production levels of defendant's Fort Wayne operation were at their highest levels.

18. Less than two months after plaintiff assumed his position as a managerial employee, the hourly employees at defendant's Fort Wayne plant went on strike. That strike, which began November 1, 1979 was to be the longest in defendant's history and was to last until April 21, 1980.

19. During the strike, production of defendant's vehicles in Fort Wayne was at a standstill. International Harvester did, however, retain its managerial employees on its payroll. The managerial employees attempted, if possible, to complete production of vehicles in progress and further sought to provide parts to sister-nonstriking plants and dealer/distributors of defendant. In essence, the managerial employees attempted to perform many of the tasks of the hourly employees during non-strike times.

20. After the strike, it was presumed that production overall (both in the heavy duty division and utility (Scout) division) would remain at the level which existed just prior to the strike.

21. The post-strike optimism regarding production levels was shortlived particularly with respect to the utility (Scout) plant in Fort Wayne. Any optimism with respect to the other operations in Fort Wayne was also to be shortlived.

22. Whether due to economic conditions or otherwise it became abundantly clear by mid-1980 that the utility (Scout) plant was in serious trouble. Though immediately subsequent to the strike approximately 100 Scouts were produced daily and approximately 100 managers were employed in that production, by late May 1980 only 51 Scout vehicles were produced daily.

23. Those managerial employees at the utility (Scout) plant not required with respect to the production of the remaining 51 vehicles a day were available for assimilation into the heavy duty truck plant and the Axle and Transmission Division. Those from the utility (Scout) plant who were not assimilated into the managerial work force

of the heavy duty truck plant or the Axle and Transmission Division were separated.

24. The assimilation of utility (Scout) employees resulted in the displacement of those managerial employees at the heavy duty truck plant and the Axle and Transmission Division who were deemed to be less qualified than those assimilated.

25. The concern with respect to the utility (Scout) operation was not unfounded. By July 1980, it became clear that International Harvester would either have to sell the production of that vehicle in Fort Wayne or close its production in this City. In October 1980, the last Scout was built in Fort Wayne, Indiana.

26. As with the utility (Scout) plant, a similar decline occurred with respect to the heavy duty truck production of International Harvester in Fort Wayne. In late April 1980, the heavy duty truck installation in Fort Wayne was producing approximately 202 vehicles per day. Within approximately three months, the same plant was producing 120 vehicles per day for a decrease of almost 40%.

27. With the reductions in production utility (Scout) vehicles and heavy duty trucks in Fort Wayne, it became readily apparent to both the upper echelon management locally, and corporate headquarters in Chicago, that the curtailed production should be offset with a corresponding reduction in operating costs.

28. Operating costs could be reduced either directly—by a reduction in the work force through separations and/or retirement—or indirectly—by cutting down phone and utility bills, etc.

29. Reductions in the work force at the Fort Wayne plant occurred in clusters and were precipitated by one or the other of two events: (1) reduction in production levels, or (2) directives ("edicts") from defendant's world headquarters in Chicago that separations would occur unrelated to production schedules.[2]

---

2. The "edicts" from Chicago took many forms. Occasionally, the Fort Wayne plant was directed

to reduce costs by "x" amount of dollars. How that reduction was made was left in the hands

30. At the Fort Wayne plant, the first of the managerial separations due to economic conditions occurred in June of 1980. Separations continued until the plant closed on July 15, 1983. Between June 1980 and July 1983, over 500 managerial employees were separated from defendant's Fort Wayne manufacturing operations.

31. In an effort to make the separations equitable, certain guidelines were established by defendant's headquarters. In determining who would go when, those involved in the separation process were to consider the following factors:

> Any decision which is made as to the people who will be part of the reductions must take into consideration the work to be done, performance, length of service and our non-discrimination policy. In addition, affirmative action principles require that the percentage of minorities and women should remain approximately the same after reduction within each organizational area as it was before reduction.

(Def.Ex. FN; May 15, 1980 letter of R.H. Medland). Thus, affirmative steps were taken by the defendant to make sure that those separated were not less qualified and that the separations would not violate the non-discriminatory policy of the company.

32. Managerial responsibilities expanded as the managerial work force contracted given the fact that the process of building a truck encompasses a myriad of specific functions. In times of high production and consequent high employment, the tasks entailed in producing a truck, being performed as they are by larger numbers of people, have little overlap. When the number of managerial employees is reduced and production is not reduced, however, the scope of the supervising manager's responsibilities necessarily increases both in terms of the management of the functions of those subordinates under him, as well as the geographical area over which those functions are performed. Likewise, when production drops, and resulting concomitant reductions in both hourly rated and managerial work force occur, virtually the same basic tasks are still required to be performed with respect to the building of a truck, but in such a situation both the hourly rated employee and the managerial employee have assumed a greater number of these tasks. Thus, in times of a declining managerial work force, there is a frequent reordering of the managerial responsibilities, both in what the manager supervises with respect to tasks directly related to the assembly of a truck and in the geographical area over which the manager performs such supervision. Consequently, as the International Harvester managerial work force shrank, the emphasis upon managerial skills increased.

33. Upon notification of the necessity to reduce managerial manpower, the executive staff of the Fort Wayne plant, with assistance of its Industrial Engineering Department, reviewed the overall organization of the plant and assigned to the managers of the various departments within the plant the obligation to reduce their departments by a specific number of people. These assessments as to where managerial personnel would be eliminated were based upon judgments of the executive staff as to how the managerial organization could be reduced in size and still accomplish the required direct and indirect tasks involved in truck production. It was the task of the managers of the various divisions losing managerial personnel to determine which specific managerial employees within the managers' respective divisions would be listed for separation. The criteria utilized by the managers was the performance of the individual managerial employees measured against the work to be performed presently and the work that would be performed in the future given a work force continually contracting in size.

---

of the managers at the Fort Wayne plant. On other occasions, headquarters would mandate that a particular division become as competent or cost efficient as a comparable division in a sister plant. This was known as "best ball." All of the varied approaches had a common goal— to produce efficiently in light of the decreased demand for International Harvester trucks.

34. When it became apparent that separations of managerial employees was to occur, the names of those managerial employees were reviewed by the executive staff of the plant in Fort Wayne including Human Resources, which at that time was managed by Roger Bartholow. Human Resources personnel studied the makeup of each list of those proposed for separation at any given time, monitoring the impact that such separations would have on persons of protected class status in the defendant's work force at its Fort Wayne manufacturing installations. It was the responsibility of the Human Resources personnel to be satisfied that no protected class status individual was placed on a list of personnel proposed for separation by reason óf that protected class status; and, as to those protected class status individuals who appeared on the list, to be satisfied that the decision for placing such persons on the list of those to be separated was because they were less qualified than those remaining in the work force to perform the work to be done.

35. Ultimately, as elsewhere, the need for reduction hit Inspection, Department 52. Department 52 fell within the jurisdiction of Product Quality which was headed by E. John Oltesvig who, at all relevant times, was the manager of Product Quality (the third highest position at the Fort Wayne heavy duty truck plant). The Product Quality Department encompassed both the Quality Assurance Department (headed by Mr. B. Biedenweg) and the Inspection Department (headed by Mr. Stanley Stucker).

36. Together, Inspection and Quality Assurance encompassed quality control functions with respect to the truck vehicles being produced at the Fort Wayne plant. Inspection was basically an on-site function, performed both contemporaneously with the functions of assembly as the truck passed through the various assembly procedures on the assembly line and included a final inspection of the finished truck before it left the manufacturing site for delivery to the customer. Quality Assurance, generally, was involved both with setting the procedures governing the inspection functions (done by Department 52) and with responding to information fed back to the Fort Wayne plant as the trucks were used by the customer in the field.

37. In December 1981, it was determined that three people should be separated from the Product Quality Division of the Fort Wayne heavy duty truck plant. As things turned out, plaintiff (Roe), Bocock, Lash and Durham were separated from Inspection, Department 52 that month, while Messrs. Swinger and Tucker were separated from the Quality Assurance Department.

38. Within one month of plaintiff's separation, three other employees moved into Inspection, Department 52. Those three employees included Gene Landon, Judy Sciarini and Pete Matoraji. Thus, in total, the Product Quality Division had, in essence, reduced its work force by three members.

39. The ultimate responsibility for determining which members of the Inspection Department would be separated fell upon the shoulders of Stanley Stucker. From May of 1981 to June of 1982, Mr. Stucker was the Superintendent of Inspection of Department 52. Like many of his subordinates, Mr. Stucker had risen through the ranks of defendant's company despite a limited formal education. The court found Mr. Stucker to be a remarkably diligent and conscientious management employee of International Harvester and a wholly credible witness.

40. In making the separation decisions, Mr. Stucker believed that the best managers for Inspection were those who could communicate well and motivate others. This was so because of the fact that with a decreasing number of managers each would have expanding duties. Thus, it was not necessary that a manager have the technical knowledge to build a truck from scratch. Rather, it was necessary that a manager be able to communicate to, and motivate, the hourly employees to which the manager was assigned. All things be-

ing equal, an employee with greater seniority would be retained over one with less seniority.

41. Further taken into consideration in determining whether a given employee was to be retained or separated was the employee's performance as set forth on yearly achievement evaluation forms. The achievement evaluation forms contained comments about an employee's abilities and shortcomings and further "ranked" the employee's performance as a manager. When the relevant achievement evaluation forms of those remaining as Inspectors, Department 52 after plaintiff's separation are compared with plaintiff's evaluation forms, it becomes quite clear that those retained were more qualified than plaintiff both in general and with respect to the particular criteria utilized by Stucker.

42. The decision to terminate plaintiff was concurred in by Mr. Oltesvig, the Manager of Product Quality. When that decision reached defendant's Human Resources Department, its Manager, Mr. Bartholow, recognizing plaintiff's seniority, spoke with both Mr. Oltesvig and Mr. Stucker to assure himself that plaintiff's separation was to occur for reasons other than his age. After conversations with those involved, Mr. Bartholow was convinced that plaintiff's separation was not because of age, but rather resulted from the company's concern that the best of those remaining would be retained.

43. With few exceptions the managerial work force increased in age as each separation occurred. The increasing age of the work force was indicative of the fact that those with more experience (generally) were retained.

44. The court finds that age was not a factor in plaintiff's separation. The court further finds that those retained in, or brought into, Inspection, Department 52, were more qualified than was plaintiff given the increasing workload each manager

was expected to perform and the criteria which properly controlled the separation decisions.

### Conclusions of Law

Out of concern that "older workers [would] find themselves disadvantaged in their efforts to retain employment," 29 U.S.C. § 621(a)(1), Congress, in 1967, enacted the Age Discrimination in Employment Act. The central purpose behind the enactment was "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age in employment." 29 U.S.C. § 621(b).

■ The Age Discrimination in Employment Act prohibits an employer from discriminating against any individual, between the ages of 40 and 70, with respect to the terms and conditions of employment because of such individual's age. It does not, however, prohibit an employer from discharging an individual for good cause, so long as the individual's age was not a determining factor in the employment decision. 29 U.S.C. §§ 623, 631. As with employment discrimination actions under Title VII (42 U.S.C. §§ 2000e, *et seq.*), there are two theories available for proving discrimination claims under the ADEA: disparate treatment and disparate impact.[3] *See generally EEOC v. Western Electric Co.*, 713 F.2d 1011 (4th Cir.1983); *Allison v. Western Union Telegraph Co.*, 680 F.2d 1318 (11th Cir.1982).

As previously indicated, plaintiff alleges that he was discriminated against by reason of his age when he was separated on December 11, 1981. It is undisputed that plaintiff, being fifty years of age at the time, fell within the protections afforded by the provisions of the Age Discrimination in Employment Act statute referred to above. What is disputed is whether or not plaintiff

---

**3.** A disparate impact case results when employment practices that are facially neutral in their treatment of different groups fall more harshly on one group than another, and they cannot be justified by business necessity. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) *cited in Allison v. Western Union Telegraph Co.*, 680 F.2d at 1321–1322.

has established a claim of disparate treatment under that Act. The court is of the view that he has not.

 In an ADEA case, the plaintiff carries the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Basically, the plaintiff must raise an inference that the employer intended to discriminate against him because of his age. Upon establishing a *prima facie* case of age discrimination, the burden of presenting evidence shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected for a legitimate nondiscriminatory reason. The defendant must sufficiently justify its employment decision in order to meet the plaintiff's claim of a *prima facie* case by presenting the legitimate reasons, and to establish a framework so that the plaintiff has an opportunity to demonstrate that the defendant's decisions were, in fact, pretextual. If the defendant carries its burden of articulating a legitimate nondiscriminatory reason for its employment decision, then the plaintiff has the burden to demonstrate that the defendant's legitimate reasons are only a pretext for age discrimination. *See e.g. McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

 Generally speaking, in order to establish a *prima facie* case it is incumbent upon plaintiff to show:

1. That plaintiff was a member of the protected class (age 40–70);

2. That he was qualified for the position;

3. That despite these qualifications he was discharged; and

4. That he was replaced with a person outside the protected class.

*See e.g. Schwager v. Sun Oil Co.,* 591 F.2d 58 (10th Cir.1979); *Price v. Maryland Casualty Co.,* 561 F.2d 609 (5th Cir.1977).[4] Where, as here, an overall reduction in the work force takes place, the foregoing elements of a *prima facie* case have been refined by some courts. In such cases, a plaintiff must prove the following elements to establish a *prima facie* case:

(1) He must show that he is within the protected age group and that he has been adversely affected—discharged or demoted—by defendant's employment decision;

(2) He must show that he was qualified to assume another position at the time of discharge or demotion; and

(3) He must produce evidence, circumstantial or direct, from which the fact finder may reasonably conclude that the *employer intended to discriminate* in reaching the decision at issue.

*Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981) (emphasis added); *see also EEOC v. Western Electric Co.,* 713 F.2d 1011 (4th Cir.1983); *Allison v. Western Union Telegraph Co.,* 680 F.2d 1318 (11th Cir.1982); *Marson v. Jones & Laughlin Steel Corp.,* 523 F.Supp. 503, 505 n. 1 (E.D.Wis.1981).

In the present matter, the parties disagree as to which of the foregoing elements

---

**4.** Other courts, in nonreduction cases, while in substantial agreement with the first three elements, replace the fourth element and require plaintiff to show only that the position remained open and that the employer continued to seek applicants. *See Cova v. Coca-Cola Bottling Co. of St. Louis, Inc.,* 574 F.2d 958, 959 (8th Cir.1978); *cf. Mistretta v. Sandir Corp.,* 649 F.2d 1383, 1386 (10th Cir.1981).

Given the choice, the court is of the view that the *Price* and *Schwager* cases present the better view in light of the purposes underlying the enactment of the ADEA. Since it is incumbent upon plaintiff to establish that age was a "determinative factor" in defendant's action, *Tribble v. Westinghouse Electric Corp.,* 669 F.2d 1193 (8th Cir.1982), proof that the employee replacing plaintiff was not in the protected class seems essential to establish any inference of discriminatory intent. Though it appears that the United States Court of Appeals for the Seventh Circuit has yet to directly pass on this precise issue, that court on at least one occasion has tacitly recognized this to be essential element for a *prima facie* case under the ADEA. *Golomb v. Prudential Insurance Co. of America,* 688 F.2d 547, 549 (7th Cir.1982). In the present matter, the distinction is irrelevant since it is clear that after plaintiff's separation, persons both within and without the protected age group transferred into Department 52.

of a *prima facie* case are applicable given the facts of this case. That dispute, however, is of no great moment because this court is of the view that under either approach, plaintiff has wholly failed to make out a *prima facie* case of age discrimination.

■ To be sure, plaintiff did establish a *prima facie* case of age discrimination insofar as he proved that he was within the protected class and that others, outside of the class, were retained. Plaintiff failed to prove by a preponderance of the evidence, however, that he remained qualified for the position of Inspection Foreman, Department 52 in the context of a declining work force and that, despite his qualifications, he was separated.

While plaintiff was a competent employee and qualified for the job of Inspection Foreman in normal economic times, his qualifications did not meet the company's expectations of its managerial employees at the time of his separation, when the Fort Wayne installation was struggling for economic survival.

■ In order to be "qualified" for the purpose of proving a *prima facie* case, an employee must meet his employer's expectations. That is, an employee is charged with the burden of affirmatively proving by a preponderance of the evidence that he was qualified, in the sense that he could satisfy his employer's expectations at the time of his discharge. *See Huhn v. Koehring Co.*, 718 F.2d 239 (7th Cir.1983); *Kephart v. Institute of Gas Technology*, 630 F.2d 1217 (7th Cir.1980).

As the findings of fact make clear, as the managerial work force at defendant's Fort Wayne installation grew smaller, the responsibilities of individual managers increased making the job more difficult. As the job became more difficult, expectations increased. It was expected that the remaining managers would be able to communicate with and motivate the fewer and fewer remaining hourly employees. Plaintiff wholly failed to show that he possessed the requisite managerial skills to remain as a First Line Supervisor in the ever-diminishing Department 52.

If, in fact, plaintiff failed to establish a *prima facie* case of age discrimination under the generally recognized elements, he certainly failed to establish a *prima facie* case in a work force reduction case. The main difference between the two types of cases is that, in the latter, a plaintiff in his *prima facie* case must prove by a preponderance of the evidence that defendant intentionally discriminated against him on the basis of his age. That is, plaintiff must produce evidence showing that "(1) defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration." *Williams, supra* at 130.

■ Plaintiff did not prove that defendant intended to discriminate against him on the basis of his age. While it may be true that plaintiff missed maximizing his pension benefits by one year and three months before he acquired thirty years' service, that standing alone is insufficient to establish the element of intent for a *prima facie* case, *see e.g. Marson v. Jones & Laughlin, supra,* particularly given the fact that plaintiff was eligible for immediate pension benefits and further · given the fact that other managerial employees who were retained became eligible for increased benefits. Moreover, the testimony was undisputed that age was a neutral factor in the separation decisions and, if anything, it was a positive factor in plaintiff's case because he had many years of seniority.

Taken in balance, the court is of the view that plaintiff failed to establish a *prima facie* case of age discrimination. That conclusion remains whether the court applies the traditional test for a *prima facie* case under the ADEA, or the test utilized for reduction in work force cases.

■ Suppose the foregoing is incorrect and that plaintiff has established a *prima facie* case. The inquiry then would be whether or not defendant can prevail. The court is of the view that even assuming,

*arguendo,* a *prima facie* case of age discrimination has been established, defendant can and should still prevail for the following reasons.

■ Much like the order of proof test established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for Title VII cases, "[o]nce a prima facie case has been made out [under the ADEA] the burden shifts to the employer to rebut plaintiff's showing." *Cova, supra* at 959; *Loeb v. Textron,* 600 F.2d 1003 (1st Cir.1979). At this stage it is incumbent upon an employer to articulate legitimate, non-discriminatory reasons for its action. *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1222 (7th Cir. 1980). So far as relevant to the present inquiry, legitimate, non-discriminatory reasons may include economic factors, *see Toussaint v. Ford Motor Co.,* 581 F.2d 812 (10th Cir.1978); company reorganization, *see Schwager, supra;* and company policy, *see Moses v. Falstaff Brewing Co.,* 550 F.2d 1113 (8th Cir.1977).

■ In the present matter, it is clear beyond peradventure of doubt that defendant has articulated a legitimate, non-discriminatory reason for plaintiff's discharge—economic dictates. The Fort Wayne operation was scaled down as the demand for defendant's products continually declined. With the corresponding reduction in the work force, each employee's duties increased. For first line supervisors in Department 52 it was determined that the best managers were those who could communicate with, and motivate, the hourly employees. While a subjective criteria may have been utilized in determining who were the best motivators in Department 52, that standing alone does not violate the ADEA. *See e.g. Movement for Opportunity and Equality v. General Motors,* 622 F.2d 1235 (7th Cir.1980); *Hereford v. Huntsville Board of Education,* 574 F.2d 268, 270 (5th Cir.1978). "It is only when such [subjective] criteria results in discriminatory impact that a violation occurs." *Allison v. Western Union Telegraph Co.,* 680 F.2d 1318, 1322 (11th Cir.1982), *citing Hes-*

*ter v. Southern Railroad Co.,* 497 F.2d 1374, 1381 (5th Cir.1974). Here, defendant's decision, at least insofar as it impacted upon plaintiff, was not discriminatory.

Having found that the employer has articulated legitimate, non-discriminatory reasons for the discharge, "the burden of persuasion reverts to plaintiff." *Cova, supra* at 960. Plaintiff "in an age discrimination suit need not prove that the articulated reason was false." *Golomb, supra* at 551. "Instead, the plaintiff must prove that age was a determining factor in the employer's decision; the employer's articulated reason may in fact have been true, but if age was also a determining factor in the employer's decision, the plaintiff has carried his burden of proof." *Id.; see also Kephart v. Institute of Gas Technology, supra* at 1222.

■ In the present matter, plaintiff has not rebutted defendant's legitimate non-discriminatory reason nor has plaintiff shown that the reasons given by defendant were, in fact, pretextual. To show pretext, plaintiff had the burden of proving that defendant's actions favored employees who were less qualified. *See Weidman v. Western Electric Co.,* 527 F.Supp. 263, 268 (M.N.C. 1981); *also Mason v. Continental Illinois Bank,* 704 F.2d 361 (7th Cir.1983). This plaintiff did not do.

Taken in balance, the court is of the view that plaintiff failed to establish that he was discriminated against on the basis of his age in violation of the Age Discrimination in Employment Act. Accordingly, judgment must be entered in favor of the defendant.

### Conclusion

On the basis of the foregoing, it is CONSIDERED, ORDERED, ADJUDGED and DECREED that judgment and costs be entered in favor of the defendant.

SO ORDERED.