This appeal is before the Court on the accelerated docket pursuant to App.R. 11.1 and Loc. App.R. 11.1.
Plaintiff-appellant Gwendolyn S. Minter, Ph.D appeals from the summary judgment entered in the trial court in favor of defendants-appellees Cuyahoga Community College ("Tri-C") and its President Jerry Sue Thornton, Ph.D., arising from plaintiff's claims of gender/race discrimination and constructive discharge relating thereto. Plaintiff contends that disputed issues of material fact precluded summary judgment. We find no error and affirm.
Tri-C is a two-year community college providing higher education to approximately 21,000 students at three campuses in the Cleveland area. It has a substantial record of diverse employment. The EEO breakdown of minority employment within the executive-middle management at the end of 1990 was 23.4%, compared to a pool of available minorities of 14.9%. Women comprised 36.4%, compared to 34.7% of women within the available population group.
Plaintiff, an African-American female, worked for Tri-C for over twenty years, beginning as a part-time adjunct faculty member. She subsequently held various other positions before being awarded the position of District Director III for Curriculum Management. In this position, from 1992 to 1996, plaintiff reported to Dr. Sunil Chand, the Executive Vice-President for Academic and Student Affairs. During this period, her work for Dr. Chand was satisfactory and she received no negative comments in evaluations. Also, during this time period, plaintiff received her doctorate degree in higher education administration and adult education.
Plaintiff candidly admitted that Dr. Chand supported and encouraged her throughout her Tri-C career. In 1994, Dr. Chand recommended her for the ACE Fellowship Program. This year-long program was considered a "fairly significant honor" where the fellow is given the opportunity to learn the problems, concerns and policies of other colleges, universities and other higher educational institutions.
Plaintiff considered this fellowship the "opportunity of a lifetime." She expressed her gratitude for the appointment in a letter to Dr. Chand, dated March 17, 1994: thanking him for the "vote of confidence"; stating that she was "saddened at the prospect of leaving [his] supervision and mentorship"; and recognizing his "willingness to encourage [her] professional development" and "selfless support." Plaintiff conceded during her deposition that Dr. Chand never did anything to indicate that he did not have the utmost respect for her both personally and professionally. Nor did she have any difficulties with the Tri-C President, Dr. Jerry Sue Thornton, who likewise treated her with personal and professional respect.
On October 24, 1995, plaintiff sent a memorandum to Dr. Chand requesting him to investigate her salary as compared to two other District Director IIIs, Frank Salak, director of enrollment management, and Rosemary Jones, director of planning and evaluation, who also reported to Dr. Chand. Plaintiff felt that the other directors, who were both Caucasian, were paid considerably more than plaintiff. In response, Dr. Chand contacted Dr. Frank Reis, Executive Vice-President of Human Resources/Administration who indicated that a compensation study was performed by an independent consulting firm (Towers, Perrin), in which each position was analyzed and given a value for compensation. The study revealed that plaintiff's position in curriculum was not as important to the college's success as the other directors' positions. The study also found that plaintiff's compensation was fair and in line with her job responsibilities.
At the end of the 1995 academic year, Dr. Chand recommended that Tri-C create the new position of Assistant Vice-President of Academic and Student Affairs, which would report directly to Dr. Chand. Dr. Chand's goals for the new position were expressed as follows:
 We had some new initiatives at the college that had to do with student retention, student recruitment processes, as well as procedures in which we would work with our potential students once they were enrolled. We had just reorganized the academic and student affairs division of the college, and the student affairs division had produced a document which laid out their vision, their goals, what it is that they were committed to doing. And what we needed, what the college needed was somebody to coordinate all that effort, which was a new effort.
(Chand Depo. at 11-12).
One of the critical roles of this position would be working with the deans of all three Tri-C campuses and with the vice-presidents of the institution. Therefore, Dr. Chand felt that the position would be senior to the line of deans at the college and that he needed someone of the "vice-presidential level in order to provide that interface." (Chand Depo. at 12).
Subsequently, Tri-C began advertising the position in the summer of 1996. The first stage of the hiring process involved a screening committee, known as the Selection Advisory Committee, which selected the applicants to be interviewed. The Committee was comprised of two males and two females. Out of forty applications, six applicants were called in for interviews. In August/September, the Committee made its unanimous recommendation of three finalists to Dr. Chand. Those candidates were plaintiff, Dr. Thomas Coley and Beverlee McClure. Neither Dr. Chand nor Dr. Thornton had any contact or involvement in the screening committee process or its recommendations.
The second stage of the hiring process involved a meeting with Dr. Chand after which he would make his recommendation to the human resources office as to who should be hired. Based on his personal interviews with the candidates, his review of their applications, and their reference checks, Dr. Chand recommended Dr. Coley for the position to Dr. Reis. Dr. Coley was ultimately approved and hired by Tri-C's Board of Trustees.
The record reflects that Dr. Coley had administrative experience above the deans' level. Between 1982 and 1986, Dr. Coley was Assistant Provost for the Admission of Human and Community Resources at the University of Maryland where his responsibilities included recruitment, student recruitment, administrative review, academic program review and affirmative action. In 1986, Dr. Coley accepted the position of Executive Assistant to the President at Cal-State Fullerton where he was responsible for governmental affairs, faculty and student programs and budgeting. In 1990, Dr. Coley became Assistant Vice-Chancellor for Academic Affairs at the Oregon State System of Higher Education. In this capacity, he was responsible for academic program review, diversity of faculty and students and the articulation and transfer of students between two year and four year institutions within the state.
On the other hand, Dr. Chand considered plaintiff's strengths for the position to be that she was "extremely well-known at the institution, she "had a long tenure at the institution in different roles," she had "worked very closely with other faculty, she had demonstrated a "very high achievement in terms of finishing a doctoral degree," and that she had a very good work ethic and work habits.
Dr. Chand explained why he felt that Dr. Coley's credentials were superior to plaintiff's as follows:
 On the one, he certainly had functioned at the level of dean and higher. In terms of the technical credentials listed on the paper, he had that experience, administrative experience, which was a clear enough distinction there. He had extensive experience with student affairs in a variety of environments. And he had worked fairly extensively in the area of technology deployment in academic and student affairs. He had extensive budget experience and had had exposure, in terms of his regular work, to the senior-most levels of academic administration. Some of those are not written into the job, so I make the distinction here between the technical requirements of the job description and the credentials as I saw them. So looking at the paper, that's what I saw.
(Chand Depo. at 29).
Plaintiff resigned immediately after learning that she had not been selected for the new position. Efforts by Drs. Chand and Thornton to encourage plaintiff to stay on were unsuccessful. On January 23, 1998, plaintiff brought suit against Tri-C raising claims of gender/race discrimination and constructive discharge. Following subsequent discovery, the trial court granted summary judgment in defendant's favor leading to this timely appeal.
We will address the plaintiff's assignments of errors in the order asserted.
 I. THE TRIAL COURT ERRED IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF GENDER DISCRIMINATION WHERE APPELLANT HAS RAISED GENUINE ISSUES OF MATERIAL FACT IN SUPPORT OF HER CLAIMS.
Appellate review of summary judgments is de novo. Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105; Zemcik v. La PineTruck Sales Equipment (1998), 124 Ohio App.3d 581, 585. The Ohio Supreme Court recently restated the appropriate test inZivich v. Mentor Soccer Club (1998), 82 Ohio St.3d 367, 369-70 as follows:
 Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt
(1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274.
Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56 (E). Mootispaw v.Eckstein (1996), 76 Ohio St.3d 383, 385. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-59.
R.C. 4112.02 (A) provides that it is an unlawful discriminatory practice for any employer "because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Ohio Supreme Court has held that federal case law interpreting and applying Title VII of the Civil Rights Act of 1964, § 2000 (e) et seq,
Title 42, U.S. Code, is generally applicable to cases involving R.C. Chapter 4112. Genaro v. Cent. Transport, Inc. (1999),84 Ohio St.3d 293, 295; Ohio Civil Rights Comm'n v. Ingram t(1994),69 Ohio St.3d 89, 93; Madera v. Satellite Shelters, Inc. (August 12, 1998), Cuyahoga App. No. 73172, unreported.
Recently, this Court in Gliner v. Saint Gobain/NortonIndustrial Ceramics Corp. (June 10, 1999), Cuyahoga App. No. 74055, unreported, set forth the principles that must be applied in a gender/race discrimination case. In Gliner, we stated that in order to present a prima facie case of discrimination, the plaintiff "must establish the following: (1) that she is a member of a protected class covered by Title VII or its Ohio equivalent; (2) that she was discharged; (3) that she was qualified for the position; and, (4) that she must offer direct, circumstantial, or statistical evidence tending to indicate that the defendant singled her out for discharge for impermissible reasons. Id.,
citing Anderson v. Premier Industrial Corp. (C.A.6, 1995), 62 F.3d 1417; Ailor v. First State Bank off Maynardville (C.A.6, 1991), 940 F.2d 658.
We also stated in Gliner:
 In civil rights employment discrimination cases a burden shifting procedure is initially utilized. This procedure, enunciated in McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, consists of a three-part process of burden of proof shifting. First, plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination, thereby creating a rebuttable presumption that the defense unlawfully discriminated against the plaintiff. If plaintiff establishes a prima facie case, the burden then shifts to the defense to produce evidence which, taken as true, establishes a legitimate, non-discriminatory reason for the adverse action. If the defense carries its burden of production, the prima facie case is rebutted and becomes irrelevant and drops from the case, see, St. Mary's Honor Center v. Hicks (1993), 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, and the burden then shifts back to the plaintiff to present evidence that the non-discriminatory reasons advanced by the defense for the terminations were merely a pretext. It is noted that plaintiff retains the ultimate burden of persuading the trier of fact that she had been the subject of intentional discrimination. 509 U.S. at 507, 113 S.Ct. at 2747-2748, quoting, Texas Dept. of Community Affairs v. Burdine
(1981), 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207. It is also noted that plaintiff must not only demonstrate that the defendants offered reasons was a pretext, or false, plaintiff must still demonstrate "that discrimination was the real reason." Hicks, 509 U.S. at 515, 113 S.Ct. at 2752. In short, plaintiff must establish intentional discrimination by a preponderance of the evidence to prevail. Id. at 519.
In her attempt to establish gender discrimination, plaintiff asserts the following:
 Appellant offered evidence to show that Appellee violated its own rules and policies, including its Affirmative Action Policies in hiring Coley; that Appellee has definite problems with the number of women in the position of Assistant Vice-President and higher; [and] that Appellant was more qualified than Coley in virtually every respect of the job. * * *
(Aplt's Brf. at 11).
We find that plaintiff's assertions are unsupported by the record and unpersuasive.
Plaintiff asserts that Tri-C violated its own Affirmative Action Policy and "tie-breaker" policy by hiring Dr. Coley, rather than plaintiff. The Cuyahoga Community College Affirmative Action Plan Profile for the position of assistant vice-president reflected that the total number of male employees in middle management was sixteen (16), the total number of females was eleven (11) and the total number of minorities was eight (8). The Plan then stated that "the College Affirmative Action Plan identifies a hiring opportunity of (7) Females to meet these goals" and that the "hiring area may consider reviewing all ethnic and racial categories." Plaintiff's explanation of the "tie-breaker" policy is: "If the two candidates possess qualifications considered to be equal, then every consideration will be given to either the internal applicant or the individual who will contribute most to the objectives of the College's Affirmative Action Program." Plaintiff further claims that Tri-C had "definite problems with the number of women in the position of Assistant Vice-President and higher" because only two females were included in the seventeen employees who occupied upper and middle management positions at Tri-C. (Aplt's Brf. at 6-7)
We find that nowhere in the record nor in this Affirmative Action Plan Profile does it state that the hiring committee is required to pass on the most qualified applicant and hire in strict accordance with the Plan. In fact, the Plan Profile expressly states only that it is to be "considered" by the Staffing Advisory Committee at the initial/first meeting. In fact, Dr. Chand testified that the affirmative action policy did not require him to give any preference to gender when hiring. Furthermore, plaintiff has set forth no evidence, other than her own self-serving assertions, that Dr. Chand's hiring of Dr. Coley was gender or racially motivated. We further find that Tri-C's affirmative action plan and its "Tie-breaker" policy were provided as guidelines for employment decisions and not as requirements and that the hiring of the most qualified candidate, even if against such guidelines, did not unlawfully violate them.
Plaintiff further claims that Tri-C had "definite problems with the number of women in the position of Assistant Vice-President and higher." Plaintiff asserts that only two females were included in the seventeen employees who occupied upper and middle management positions at Tri-C. However, this claim is contrary to the evidence presented in the record. The only evidence in support of this claim is the Affirmative Action Plan Profile which clearly sets forth the number of men, women and minorities in Tri-C's middle management. The Profile reflects that 40.7% of the "Middle Management" positions at Tri-C were held by women and that the County availability of women to fill such positions was 42.7%. The Profile further reflects that 29.6% percent of the middle management positions were held by minorities when the County availability was only 16.1%.
Nevertheless, assuming arguendo, that plaintiff has satisfied her initial burden to establish a prima facie case because she is a minority female, arguably qualified for the assistant vice-president position, who did not receive the position, and who offered indirect circumstantial evidence that she was not chosen because of her race and gender, there was no evidence of unlawful racial or gender based discrimination in the record to support her claim.
The critical issue becomes whether Dr. Chand's explanations for selecting Dr. Coley presented legitimate, non-discriminatory reasons for not hiring plaintiff. The record reflects that Dr. Chand testified that he felt Dr. Coley was the most qualified applicant based on his review of each candidate's experience and credentials. Even though the burden of presenting evidence to answer plaintiff's prima facie case, once established, shifts to the defendant, the ultimate burden of persuasion never shifts from the plaintiff. Wrenn v. Gould (C.A.6, 1987), 808 F.2d 493,501, citing Texas Dept. of Community Affairs v. Burdine (1981),450 U.S. 248, 253.
Given that Tri-C has presented a legitimate non-discriminatory reason for its employment decision, plaintiff must then prove that Dr. Chand's reason was pretextual and that the real reason for her not being selected was either her race or gender. "Pretext may be proved either by direct evidence that racial [or sexual] animus motivated the discharge or by discrediting the employer's rebuttal evidence." Plumbers Steamfitters Commt. v.Ohio Civil Rights Comm. (1981), 66 Ohio St.2d 192, 198.
Plaintiff asserts that her qualifications for the position were superior to those of Dr. Coley, and therefore, his hiring must have been unlawfully motivated. Plaintiff's only evidence to rebut Dr. Chand's explanation was her own opinion that Dr. Coley's qualifications do not compare to her own. It is well established that the plaintiff's own subjective view of his or her qualifications, without more, is insufficient to maintain a claim for unlawful discrimination.
 Proving pretext requires more than the charging party's own subjective belief that he was better qualified than the other applicants for a position. Intentional discrimination cannot be proven by conclusory allegations made by the charging party. Likewise, self-serving statements by the charging party that he believes he was discriminated against because of race are not enough.
Hollowell v. Society Bank Trust (1992), 78 Ohio App.3d 574,580-581. See also, Wrenn, supra, at 502 (plaintiff's "own perception of his competence, and the incompetence of those competing against him, is irrelevant; the search committee's perceptions and motivations are key"). In Wrenn, the court also explained the deference that should be afforded to employers when making management-level employment decisions as follows:
 It may be worthwhile to note here that Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates, United Steelworkers of America v. Weber, 443 U.S. 193, 207, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480
(1979). So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates, Burdine, 450 U.S. at 259. 101 S.Ct. at 1096; Canham, 666 F.2d at 1061; Leiberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980). An employer has even greater flexibility in choosing a management-level employee, as is the case here, because of the nature of such a position. Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 70
(6th Cir. 1982). See, also, Manson v. Continental Illinois National Bank, 704 F.2d 361 (7th Cir. 1983); Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979); Frausto v. Legal Aid Society of San Diego, Inc., 563 F.2d 1324 (9th Cir. 1977).
Id.
In the present case, we conclude that there is an inadequate evidentiary basis from which a reasonable trier of fact could find or infer that Dr. Chand's reasons for his hiring decision were pretextual and false. We find that plaintiff cannot establish that "discrimination was the real reason" for her failure to get the position.
There is no evidentiary basis in this record for a challenge to the bona fides of Dr. Chand's judgment. He was a "mentor" to plaintiff and had always treated her decently and with personal and professional respect. He encouraged her career development. He did not say or do anything during the selection interview to indicate he had some bias against her because she was a woman. She could. not say that the way Dr. Chand went about deciding between her and Dr. Coley was influenced by any gender bias. She did not know if Dr. Coley was minimally qualified or should not have been considered. She believed the screening committee recommended the "best three candidates." She acknowledged that Dr. Chand was entitled to prioritize the various duties of the new position in weighing his judgment. She conceded that she had not had dean-level responsibility, nor coordinated student affairs programs with deans. (Minter Depo. at 118, 200, 204, 233, 248-49, 253). These admissions are fatal to plaintiff's conclusory claims of pretext.
Absent any evidence that Dr. Coley's hiring was racially or gender motivated, no genuine issue of material fact exists and this Court will not create one regarding the subjective management-level hiring decisions made by the defendant employer.
Assignment of Error I is overruled.
 II. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF RACE DISCRIMINATION WHERE APPELLANT HAS RAISED GENUINE ISSUES OF MATERIAL FACT IN SUPPORT OF HER CLAIMS.
In her second assignment of error, plaintiff asserts that Tri-C committed race discrimination by paying her less than two white employees. This assertion is without merit.
In order for plaintiff to establish a prima facie case of racial discrimination in salary differentials, she must show that: (1) she was a member of a protected class; (2) she was qualified for the position held; (3) she suffered an adverse employment action; and (4) "for the same or similar conduct [s]he was treated differently than similarly-situated non-minority employees." Packer v. City of Toledo (C.A.6, 1999), 178 F.3d 1295, citing Mitchell v. Toledo Hospital (C.A.6, 1992),964 F.2d 577, 583. "The similarly-situated individuals "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id.
The record reflects that plaintiff contacted Dr. Chand requesting him to investigate her salary as compared to two other district directors, Frank Salak, director of enrollment management, and Rosemary Jones, director of planning and evaluation, both of whom also reported to Dr. Chand. Plaintiff felt that the other directors, who were both Caucasian, were paid considerably more than plaintiff. An independent Towers Perrin compensation study was performed on all positions, including plaintiff's, which revealed that plaintiff's position in curriculum was not as important to the college's success as the other directors' positions. The study also found that plaintiff's compensation was fair and in line with her job responsibilities.
As discussed and found above, plaintiff has presented no evidence to rebut this legitimate non-discriminatory reason for plaintiff's lower compensation and therefore, she has failed to satisfy her burden. Furthermore, the record establishes that Salak and Jones were responsible for departments more valuable to the college's success than plaintiff's, thereby justifying the increased compensation. Plaintiff's assertion that she is paid less than two directors from completely different departments of the university is insufficient alone to maintain this claim. We see no evidence that plaintiff's salary was unlawfully influenced because of her race.
Assignment of Error II is overruled.
 III. THE TRIAL COURT ERRED IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF CONSTRUCTIVE DISCHARGE WHERE APPELLANT HAS RAISED GENUINE ISSUES OF MATERIAL FACT IN SUPPORT OF HER CLAIMS.
In her final assignment of error, plaintiff asserts that genuine issues of material fact exist as to whether she was constructively discharged by Dr. Chand's hiring of Dr. Coley. We find that summary judgment was properly granted on this issue.
In Ohio, the test for determining whether an employee has been constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. Mauzy v.Kelly Services, Inc. (1996), 75 Ohio St.3d 578. In determining whether there was a constructive discharge, a court must "determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." Id. at 589.
In the instant case, plaintiff asserts at page thirteen of her appellate brief that her working conditions became so intolerable as follows:
 [A]ppellant had seen a continuous pressure for reduction in force on females, a preference for males, being stymied in her job, and being paid less than Caucasions (sic) (who did not hold her doctorate degree, held the same title, reported to the same person, had fewer years in the position.) Combined with Dr. Chand's discouragement of her trying to advance herself to dean and his outright rejection of her in favor of Coley for the Position, appellant has demonstrated aggravating factors justifying her claim of constructive discharge.
(Aplt's Brf. at 13).
However the record does not support these statements. The record reflects that plaintiff was not demoted, criticized in front of others, or threatened with discharge. In fact, the evidence shows that plaintiff received positive employment reviews at Tri-C which resulted in several promotions. Furthermore, Dr. Chand encouraged her and recommended her for the ACE Fellowship which she considered to be the "opportunity of a lifetime."
There is no evidence of "continuous pressure for reduction in force on females," that she was "stymied in her job," or that she was paid less because of her race. The evidence establishes that plaintiff resigned from her position because she did not receive the assistant vice-president position even though she was one of the three finalists chosen from more than forty applicants. We do not doubt that plaintiff was disappointed that she was not selected for the position. However, we do not agree, given plaintiff's professional success at Tri-C, that Dr. Coley's hiring would make a reasonable person believe that her termination was imminent. Indeed, she acknowledges that both Drs. Chand and Thornton tried to convince her to stay notwithstanding her abrupt resignation.
In Hartsel v. Keys (C.A.6, 1996), 87 F.3d 795, 800, the court rejected a similar claim as follows:
 As a preliminary matter, we reject plaintiff's suggestion that she was constructively discharged. Hartsel argues that the Mayor's failure to promote her to what she perceives as her rightful position created intolerable work conditions, such that her preemptive resignation the morning of December 31, 1992, was essentially a firing; she offers no other evidence that shows she was driven out of her prior position. If we were to accept this line of reasoning, every person passed over for a purportedly deserved promotion could bring an illegal discharge suit, and the distinction between the two would be erased. Instead, we treat her allegations as a failure to promote claim.
Based on this record, we find that no genuine issue of material fact exists as to whether plaintiff was constructively discharged. Accordingly, defendants are entitled to judgment as a matter of law on this claim and summary judgment was properly granted.
Assignment of Error III is overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
O'DONNELL. P.J., and PATTON. J. CONCUR.
 _________________________ JAMES M. PORTER JUDGE